**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,**

v.

**MANOR NURSING CENTERS, INC.,
et al., Defendants-Appellants.**

**Nos. 407–409, Dockets 71–2011,
71–2012, 71–2026.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 1971.

Decided Jan. 21, 1972.

Walter P. North, Associate Gen. Counsel, and Harvey L. Pitt, Special Counsel, SEC, Washington, D. C. (G. Bradford Cook, Gen. Counsel, Frederic T. Spindel and Thomas R. Beirne, Attys., Washington, D. C., and William Nortman, Atty., New York City, on the brief), for appellee Securities and Exchange Commission.

Lawson F. Bernstein, New York City (Harold B. Obstfeld and Charles J. Hecht, New York City, on the brief), for appellants Manor Nursing Centers, Inc., Capital Cities Nursing Centers, Inc., Ira Feinberg, Manor Construction Company, Samuel Feinberg, Suzanne Marnane and Gladys Halford.

Richard F. Horowitz, New York City (Jacob W. Heller, Howard L. Mann, and Weiss, Bronston, Rosenthal, Heller & Schwartzman, New York City, on the brief), for appellants Ivan Ezrine, Glendale, Inc. and Atlantic Services, Inc.

Bernard Jay Coven, New York City, for appellants Christos Netelkos, Method

Leasing Corporation and Upton Corporation.

Nathan D. Lobell, New York City, Court Appointed Trustee, pro se.

Before ANDERSON, OAKES and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

These appeals present again questions with respect to the scope of the antifraud provisions and of the prospectus-delivery requirement of the federal securities laws. Also involved is the type of ancillary relief necessary to effectuate the broad remedial purposes of the federal securities laws.

The Securities and Exchange Commission brought this action pursuant to Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a) (1970), and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1970). The complaint alleged violations of the antifraud provisions of both acts, Section 17(a) of the 1933 Act, 15 U.S.C. § 77q (a) (1970), Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1970), and of Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1971); it also alleged violations of the prospectus-delivery requirement of Section 5(b) (2) of the 1933 Act, 15 U.S.C. § 77e(b) (2)

(1970). After a five day non-jury trial in the Southern District of New York, Constance Baker Motley, District Judge, the court concluded that appellants had violated the antifraud provisions of the 1933 and 1934 Acts and the prospectus-delivery requirement of the 1933 Act.[1] Accordingly, the court permanently enjoined certain appellants from further violations of the antifraud provisions and the prospectus-delivery requirement; ordered all appellants to disgorge any proceeds, profits and income received in connection with the sale of the common stock of Manor Nursing Centers, Inc.; appointed a trustee to receive these funds and to distribute them to defrauded public investors; and ordered a freeze on the assets of all appellants until such time as they had transferred to the trustee the proceeds received from the sale. For the reasons stated below, we affirm in part, and reverse and remand in part.

## I. *Transactions Underlying Violations Charged*

In order to understand the issues raised on appeal and our rulings thereon, we set forth the following statement of the events which culminated in this litigation—based on the district court's findings which are supported by substantial evidence adduced at trial.[2]

---

1. Six defendants did not appeal from the judgment entered below.

 Defendants Deneso Corporation, Joseph Delmonico and Jack Naiman failed to file any pleadings or to make any appearance in this action. The court held that these defendants had violated the antifraud provisions, enjoined them from further such violations and ordered them to disgorge any proceeds received in connection with the Manor offering.

 Defendant Arthur Sutton, a selling shareholder, consented to the entry of a decree enjoining him from future violations of the antifraud provisions and the prospectus-delivery requirement. He also consented to an order requiring him to pay into the registry of the court the $43,000 he received in connection with the Manor offering.

 Defendants Benjamin Werner and Benjamin Werner & Co. were found to have violated the antifraud provisions, the prospectus-delivery requirement and Section

15(c) (2) of the 1934 Act and Rule 15c2–4 promulgated thereunder. The court enjoined these defendants from further violations of these provisions of the securities laws and ordered them to disgorge any proceeds received in connection with the Manor offering. On December 9, 1971, this Court granted the motion by these two defendants to dismiss their appeals.

2. When the instant complaint was filed, the SEC sought and obtained a temporary restraining order pending the hearing and determination of the SEC's motion for a preliminary injunction. The hearing on the preliminary injunction motion began on August 19, 1971 and was concluded on August 20. After this hearing, the court reconsidered and granted the SEC's motion to advance the date of trial and to consolidate it with the hearing on the preliminary injunction motion. The trial commenced on September 30, 1971. Thus, the trial record includes some evidence

In 1968, appellant Ira Feinberg ("Feinberg", to be distinguished from his father, Samuel Feinberg, another appellant) was the sole owner of a corporation known as 133 County Road, Inc., the only activity of which was the operation of a 64-bed nursing home in Tenafly, New Jersey. In that same year, Feinberg met appellant Ivan Ezrine, a New York attorney specializing in securities laws. After several social and business meetings, Feinberg and Ezrine jointly decided to obtain public financing for Feinberg's nursing home business.

■ As a first step in the process of selling shares to the public, a new corporation—appellant Manor Nursing Centers, Inc. ("Manor")—was organized on March 19, 1969. Manor acquired all the assets of 133 County Road and issued approximately 1.2 million shares of 5 cents par value common stock to Feinberg who then sold 62,000 shares to certain of his relatives and friends—appellants Samuel Feinberg (his father), Gladys Halford (his mother-in-law), Suzanne Marnane (his employee) and defendant Arthur Sutton (his friend). In addition, Feinberg acquiesced in Ezrine's request that nearly 138,000 shares of Manor be sold to two corporations which Ezrine controlled[3]—appellants Glendale, Inc. ("Glendale") and Atlantic Services, Inc. ("Atlantic").[4]

Ezrine and Feinberg then decided that Manor would offer 350,000 shares of newly issued 5 cents par value common stock to the public at a price of $10 per share. After expenses, this offering would raise approximately $3 million for the operation of Feinberg's nursing home business. In addition, Ezrine and Feinberg decided that 100,000 shares held by Manor's stockholders would be offered at the same $10 price. After expenses, approximately $868,000 would then be paid to the selling stockholders in the following amounts:

| Selling Shareholder | Shares Offered | Net Proceeds |
|---|---|---|
| Feinberg | 62,500 | $542,500 |
| Glendale | 15,000 | 130,200 |
| Atlantic | 10,000 | 86,800 |
| Samuel Feinberg | 2,500 | 21,700 |
| Marnane | 2,500 | 21,700 |
| Halford | 2,500 | 21,700 |
| Sutton | 5,000 | 43,400 |
| Totals | 100,000 | $868,000 |

To Ezrine was entrusted the preparation of the registration statement and all other documents necessary to offer Manor shares to the public. Ezrine also selected the accountant for the offering as well as the underwriter, defendant Benjamin Werner & Company, of which defendant Benjamin Werner is the owner. The evidence showed, however, that Ezrine consulted with Feinberg when questions arose about the offering and supporting documentation.

With respect to the issues raised on this appeal, it is important to note several representations which Manor and its principals made concerning the terms of the offering. First, the offering was presented on an "all or nothing" basis.

which actually was presented at the hearing on the preliminary injunction motion. Rule 65(a) (2), Fed.R.Civ.P.

3. There is ample evidence to support the district court's finding that "Ezrine exercised blanket authority in the matter of securities transactions in connection with the Manor offering" for both Glendale and Atlantic. Accordingly, we hold that Glendale and Atlantic are corporate embodiments of Ezrine and his awareness of the securities laws violations are imputed to them. SEC v. North American R. & D. Corp., 424 F.2d 63, 79 (2 Cir. 1970).

4. After these various sales of Manor stock, appellants and defendant Sutton owned the following number of shares:

| Name | Shares Owned |
|---|---|
| Appellant Feinberg | 975,000 |
| Appellant Glendale | 127,500 |
| Appellant Atlantic | 10,000 |
| Appellant Samuel Feinberg | 10,000 |
| Appellant Marnane | 12,500 |
| Appellant Halford | 5,000 |
| Defendant Sutton | 34,600 |
| Total | 1,174,600 |

This meant, according to the prospectus, that:

> "Unless all such 450,000 shares are sold to the public and the proceeds received therefrom within such sixty (60) day period (unless extended for an additional thirty day period), the offering will terminate and all funds will be returned, without interest, to subscribers."

Secondly, the prospectus stated that "subscribers' funds will be maintained in escrow [and] will not be available for other use . . . ." In this connection, the prospectus represented that "[a]rrangements have been made with Chemical Bank for the escrow of the funds received during the course of such offering." Thirdly, the registration statement indicated that shares sold in the offering would be sold only for cash.[5] Finally, the documents prepared in connection with the Manor offering did not disclose that certain purchasers and participating brokerage firms would be offered or would receive special compensation for their agreement to participate in the offering.

The offering of Manor shares began promptly on December 8, 1969, the effective date of the registration statement. Contrary to the representation made in the prospectus, however, Benjamin Werner, the underwriter, had not arranged for an escrow account for the proceeds of the offering. No such account was ever established.

From the very outset, Werner encountered difficulty in selling Manor shares and requested assistance from Ezrine and Feinberg. In response to Werner's request, Ezrine and Feinberg personally solicited brokerage firms, various corporations and individuals in an attempt to interest them in the Manor offering.

As a result of his inquiries, Feinberg arranged to meet with representatives of a New Jersey-based brokerage firm, Carlton Cambridge & Co., Inc., and ultimately with one of its principals, appellant Christos Netelkos, who demanded special compensation as a condition to participating in the Manor offering. After conferring with Ezrine, Feinberg agreed to give Netelkos, at no cost, 15,000 Manor shares, issued in the name of Lausanne Investment Company, a dormant company previously organized by Ezrine.[6] Feinberg also agreed to guarantee a $250,000 bank loan to Netelkos with funds received from the offering. In exchange for the free shares and the loan guarantee, Netelkos agreed that he and Carlton Cambridge would sell 142,500 Manor shares. Of these 142,500 shares, 5,000 eventually were purchased by Carlton Cambridge for its customers and 40,000 were purchased by Orvis Brothers, another broker-dealer, for its customers. The remainder—97,500 shares—were to be purchased by appellants Method Leasing Corporation and Upton Corporation, each of which was owned and controlled by Netelkos. As stated above, the Manor prospectus did not disclose the existence of any special compensation offers or agreements.

In an effort to find additional willing buyers, Ezrine arranged a meeting with defendant Deneso Corporation and its principals, defendants Joseph Delmonico and Jack Naiman. At the meeting which both Feinberg and Ezrine attended, Delmonico and Naiman refused to participate in the Manor offering without some form of special compensation. After several subsequent conversations, the Dene-

---

5. Item number four of the Cross-Reference Sheet in Manor's registration statement was entitled "Sales Otherwise Than for Cash." Manor indicated that this item was "not applicable" to its offering.

6. Despite Ezrine's denials, we find ample evidence to support the district court's finding that Ezrine knew about and authorized the special compensation given to Netelkos. Ezrine himself concedes that Feinberg consulted him about the propriety of granting Netelkos special compensation for participating in the Manor offering. Moreover, the 15,000 Manor shares which Netelkos was to receive without cost to him were issued in the name of a company—Lausanne Investment Company—which Ezrine had organized and with which Ezrine was closely affiliated.

so group agreed to purchase 170,000 Manor shares in exchange for an arrangement whereby Deneso would be protected from any loss as a result of its subscription and Ezrine would cause appellant Glendale to repurchase Deneso's Manor shares at a substantial profit to Deneso.[7] This arrangement with Deneso was not disclosed in the Manor prospectus. Thus, at the same time that unsuspecting public investors were being offered and were buying Manor shares at the full price of $10 per share, Netelkos and Deneso were purchasing Manor shares for substantially less than the price announced in the prospectus.

Needing the proceeds of the offering to take advantage of certain business opportunities, Manor and its principals decided to hold a closing of the offering on February 20, 1970, several weeks prior to the March 8 selling deadline. It soon became apparent, however, that not all of the 450,000 Manor shares had been purchased. Rather than cancel or postpone the closing, Feinberg and Ezrine attempted to dispose of all the remaining shares by engaging in a series of transactions which violated the terms of the offering.

As a first step, Carlton Cambridge was informed that its selling commission on the 142,500 Manor shares which had been allotted to it and Netelkos—$142,500— would be paid in securities rather than cash. Carlton Cambridge and Netelkos therefore subscribed to 142,500 shares but paid for only 128,250, despite the explicit provisions of the Manor offering that shares would be sold only for cash and that selling commissions could not and would not be paid until all 450,000 shares had been sold.

Even after disposing of these 14,250 shares, the Manor offering was not fully subscribed. Ezrine and Feinberg then participated in several transactions designed to "sell" an additional 39,200 Manor shares. First, Ezrine accepted 5,000 Manor shares in lieu of his $50,000 legal fee as special counsel to Manor for the offering, notwithstanding that the registration statement by its terms precluded sales of securities for consideration other than cash. In addition, appellants Glendale and Atlantic, the two corporations controlled by Ezrine which were selling stockholders, purchased a total of 21,700 shares. Contrary to the terms of the prospectus, however, these 21,700 shares were purchased with checks which were drawn against the proceeds of the offering—proceeds to which Glendale and Atlantic were not entitled until all the Manor shares had been sold and full payment had been received. Similar to Glendale's and Atlantic's premature use of the proceeds, Feinberg drew a check against the proceeds of the offering for $133,000 payable to Great Oil Basin, a corporation controlled by Ezrine, in purported repayment of a loan made by Great Oil Basin to Manor. Ezrine on behalf of Great Oil Basin then endorsed the check and purchased 12,500 Manor shares. It is clear that Ezrine purchased the Manor shares on behalf of his corporations knowing that each of these transactions violated the explicit language of the prospectus and registration statement which he had prepared.

The purchases by the corporations controlled by Ezrine did not result in the complete subscription of the Manor offering. Feinberg and Ezrine then permitted the distribution of over 14,000 Manor shares to certain of Manor's trade creditors in full payment of outstanding indebtedness, notwithstanding that the registration statement stated that Manor securities would be issued only for cash.

---

7. We hold that there was sufficient evidence to support the district court's finding that a special compensation agreement was made with the Deneso group. Feinberg testified that an agreement to furnish extra compensation had been reached and that he had retained a copy of the agreement. Moreover, Ezrine and Feinberg continued to meet with representatives of Deneso after Deneso informed them that they would not participate in the offering without some form of special compensation.

Despite these various transactions which contravened the stated terms of the offering, there still remained 11,368 shares of Manor stock for which no purchaser had been found. Feinberg purchased these shares for his friends, with all but $200 of the total $113,368 coming from checks drawn against the proceeds of the offering.

Through the device of these various "bootstrap" transactions (purchasing shares by checks drawn against proceeds) and the issuance of shares for consideration other than cash, Manor and its principals were able to make it appear that all 450,000 shares had been sold. It is obvious, however, that Benjamin Werner, the underwriter, received far less than the $4.5 million in proceeds necessary to a valid closing. Moreover, through their participation in the various transactions outlined above, appellants Manor, Feinberg, Ezrine, Atlantic, Glendale, Netelkos, Method Leasing and Upton knew that a valid closing had not occurred.

Despite the fact that all the proceeds from the offering had not been received, Werner issued checks to Manor and the selling stockholders on February 20, 1970. Apparently concerned about the risk involved in relying upon the large number of uncertified checks which he had received, Werner did advise the bank to delay payment on his checks for one day to permit clearance of the uncertified checks he had been tendered.

On February 24, 1970, the first business day after the purported closing, Ezrine caused a sticker amendment to the Manor registration statement to be filed with the Commission.[8] Although the amendment purported to disclose the full underwriter's compensation Carlton Cambridge was to receive, it significantly omitted any mention of the additional compensation appellant Netelkos had demanded and received from Manor. The amendment also explicitly represented that the entire Manor issue had been sold. At no time thereafter was this representation amended to reflect that the issue was not sold. No further amendment to the registration statement was ever filed with the Commission.

On February 24, the same day the sticker amendment was filed, Werner learned that checks issued by Deneso and Netelkos at the closing, totaling approximately $2.5 million, had been returned for insufficient funds when presented for payment. Werner informed Ezrine and Feinberg of this development. Following Ezrine's instructions, Werner stopped payment on the checks he had issued at the closing. Werner's check to Feinberg, however, for more than $559,000, the amount to which Feinberg was entitled if the offering had been completely subscribed, could not be stopped because Werner's bank erroneously had certified the check to Feinberg's bank. With this money, Feinberg purchased a $250,000 certificate of deposit with which to furnish collateral for the loan he had promised to guarantee for Netelkos.[9]

Upon the return of the Netelkos and Deneso checks for insufficient funds, it became painfully obvious to Feinberg and Ezrine that the distribution of the proceeds did not comply with the terms of the offering, since all of the proceeds had not been received. Nevertheless, rather than recapturing and returning the public investors' money, Ezrine and

8. The sticker read in full:
"Aggregate net proceeds of $4,027,500 were received by the Company ($3,132,500) and the Selling Stockholders ($895,000) from the Underwriter on February 20, 1970, from the sale of the 450,000 shares offered hereby. Carlton Cambridge & Co., Inc., one of the selling group members, may be deemed to be an 'underwriter' under the Securities Act of 1933, as amended, by reason of such firm's (i) sale of 142,500 of the shares offered hereby and (ii) receipt of payment by such firm from the Underwriter of $71,250 ($.50 per share) for dealer's concessions and $71,250 ($.50 per share) for expenses in connection therewith."

9. Feinberg also used this money to purchase the additional shares at the closing to make it appear the offering had been fully subscribed.

Feinberg embarked on a frantic campaign either to collect the money from Deneso and Netelkos or, failing in that effort, to reoffer their shares.

Feinberg's subsequent attempts to collect the $832,500 from Netelkos proved to be futile. Moreover, Netelkos defaulted on the $250,000 loan which Feinberg had guaranteed with proceeds from the offering, and Feinberg was called upon to repay the loan. Some months after the closing, Netelkos did give Feinberg and Manor approximately $200,000. Netelkos also returned his 83,250 shares and the 15,000 shares issued in the name of Lausanne Investment Company. These 98,250 shares, which were retired by Manor, were never sold.

Ezrine likewise was unable to collect on the Deneso check. In early March 1970, with the March 8, 1970 deadline fast approaching, Ezrine decided to reoffer the Deneso shares. On March 4, with Feinberg's knowledge, Ezrine arranged to sell 60,000 Manor shares to a David Haber of New York City. The district court found that Haber's purchase was induced by Ezrine's oral promise to protect him against loss on his investment and to give him $60,000. On March 5, Haber returned the shares, and Ezrine renewed his promise to pay Haber the guaranteed profit of $60,000.[10]

Between March 5, when Haber returned the 60,000 Manor shares, and March 8, the last offering date for sale of the shares, Ezrine was unable to find any purchasers. Ten days after the offering period had expired, however, Ezrine arranged to sell 60,000 Manor shares to the Daytona Beach General Hospital. Any facade of compliance with the terms of the offering was now completely dropped. Not only were the shares sold after the selling deadline, but they were sold at a price of $11 per share, rather than the original price of $10. Ezrine also represented that Manor agreed to furnish Daytona with extra compensation.[11]

Ezrine's efforts thus resulted in the sale of only 60,000 of the 170,000 Deneso shares. The remaining 110,000 shares were retired by Manor. As a result of Netelkos' and Deneso's failure to pay for their shares, therefore, more than 200,-000 of the 450,000 shares involved in the Manor offering were never sold. Despite this, neither Ezrine nor Feinberg informed the SEC that, contrary to the representation made in the sticker amendment filed on February 24, 1970, the issue had not been completely subscribed. In addition, notwithstanding that all 450,000 shares had not been sold, appellants did not attempt to return the money obtained from the public investors. Moreover, while some appellants claim they derived no financial benefit from the offering, the evidence shows that Manor and the other appellants received and retained at least $1.3 million in cash proceeds from public investors.[12]

There can be no doubt that Feinberg and the corporations which he controlled

---

10. After Ezrine reneged on this agreement, Haber instituted a lawsuit to recover the $60,000.

11. Daytona Beach General Hospital has sued Manor as a result of this transaction.

12. This approximate figure was computed as follows:

| Source of Funds | Amount Received |
|---|---|
| Daytona Beach General Hospital | $ 600,000 |
| Orvis' Customers | 400,000 |
| Carlton Cambridge's Customers | 50,000 |
| Other Purchases by Public | 317,000 |
| | $1,367,000 |

The amounts received from Daytona, Orvis and Carlton Cambridge are not disputed. In an affidavit filed with the district court, Feinberg claimed that Manor collected an additional $317,000 from public investors.

We emphasize that these figures are only approximate. It is for the trustee to compute the exact amount which Manor and the other appellants received from legitimate public investors as a result of the offering.

derived a substantial financial benefit from the offering. Feinberg received a valid check from Werner for $559,000 on the day of the purported closing. It is undisputed that from March 5, 1970 to May 1970 Manor received and retained more than $1 million in proceeds from the offering. Moreover, appellant Capital Cities Nursing Centers, Inc., which succeeded to the business and operations of Manor by virtue of a transaction in which Manor sold its assets to Capital Cities on July 27, 1970 and which, as the district court found, is "simply a new name for Manor," also derived financial benefit from the offering by acquiring Manor's assets which included some of the proceeds of the offering. In addition, the SEC presented evidence that appellant Manor Construction Company, a company controlled by Feinberg, accepted between $100,000 and $200,000 in proceeds from the sale of Manor stock.

Ezrine, as well as Glendale and Atlantic, claim that they retained no proceeds from the Manor offering. Sometime after the purported closing on February 20, however, Ezrine and an affiliated company, Great Oil Basin, sold 17,000 Manor shares to the public for $170,000. At least $125,000 of the money Ezrine used to make the original purchase of these shares came from the public investor funds received by Manor at the closing.

The SEC also presented evidence that appellants Samuel Feinberg, Marnane and Halford, as well as defendant Sutton, received in cash the money to which they would have been entitled had the issue been fully subscribed. The checks which originally had been issued by Werner on February 20, 1970 to these selling shareholders were not honored. More than a month later and after the March 8, 1970 selling deadline, however, Ira Feinberg drew checks totaling $108,500 payable to the order of Samuel Feinberg, Halford, Marnane and Sutton. These appellants have not returned these funds; Sutton did consent, however, to an order requiring him to pay into the registry of the court the $43,000 received in connection with the Manor offering. See note 1 *supra.*

Appellant Netelkos also has retained some proceeds from the offering. Feinberg guaranteed a $250,000 loan for Netelkos by purchasing a certificate of deposit with some of the proceeds of the offering. When Netelkos defaulted on the loan, the bank called upon Feinberg to pay the loan. While Netelkos has paid some money to Feinberg, it does not appear that he has repaid the entire $250,000.

## II. Violations of Antifraud Provisions of 1933 and 1934 Acts

The conduct of appellants in connection with the public offering of Manor shares, upon analysis, demonstrates beyond a peradventure of a doubt that they violated the antifraud provisions of the federal securities laws—§ 17(a) of the 1933 Act and § 10(b) of the 1934 Act.

The gravamen of this case is that each of the appellants participated in a continuing course of conduct whereby public investors were fraudulently induced to part with their money in the expectation that Manor and the selling stockholders would return the money if all Manor shares were not sold and all the proceeds from the sale were not received by March 8, 1970. It is undisputed that, as of March 8, Manor and the selling stockholders had not sold all the 450,000 shares and that all the proceeds expected from the sale had not been received. Moreover, it is clear that all appellants knew, or should have known, that the preconditions for their retaining the proceeds of the offering had not been satisfied. Nevertheless, rather than complying with the terms of the offering by returning the funds of public investors, appellants retained these funds for their own financial benefit. This misappropriation of the proceeds of the Manor offering constituted a fraud on public investors and violated the antifraud provisions of the federal securities laws. See Superintendent of Insurance of the State of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 10 n. 7

(1971); Richardson v. MacArthur, 451 F.2d 35, 40–41 (10 Cir. 1971); A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2 Cir. 1967); Cooper v. North Jersey Trust Company, 226 F.Supp. 972, 978 (S.D.N.Y.1964). As we said in A. T. Brod & Co. v. Perlow, *supra*, 375 F.2d at 397: "We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." In the instant case, we hold that the "misappropriation [of the proceeds] is a 'garden variety' type of fraud . . . ." Superintendent of Insurance of the State of New York v. Bankers Life & Casualty Co., *supra*, 404 U.S. at 10 n. 7.

All appellants also violated § 10(b) of the 1934 Act and Rule 10b–9 promulgated thereunder by making a misrepresentation with respect to the terms of an "all or nothing" offering. Recognizing the great potential for fraudulent conduct on the part of persons in connection with public offerings of securities on an "all or nothing" basis,[13] the SEC in 1962 adopted Rule 10b–9, which provides in relevant part:

"It shall constitute a 'manipulative or deceptive device or contrivance,' . . . to make any representation:

(1) to the effect that the security is being offered or sold on an 'all-or-none' basis, unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (A) all of the securities being offered are sold at a specified price within a specified time, and (B) the total amount due to the seller is received by him by a specified date. . . ."

Here, it is clear that all appellants knew that the offering was presented on an "all or nothing" basis. Moreover, the evidence established that appellants knew, or should have known, that all of the shares had not been sold and that all of the proceeds had not been received by March 8, 1970. Under the circumstances, there can be no doubt that representing that the offering would be on an "all or nothing" basis violated Rule 10b–9.[13a]

It also is clear that appellants violated the antifraud provisions of the federal securities laws by offering Manor shares when they knew, or should have known, that the Manor prospectus was misleading in several material respects. After the registration statement became effective on December 8, 1969, at least four developments occurred which made the prospectus misleading: the public's funds were not returned even though the issue was not fully subscribed; an escrow account for the proceeds of the offering was not established; shares were issued for consideration other than cash; and certain individuals received extra compensation for agreeing to participate in the offering. These developments were not disclosed to the public investors. That these developments occurred after the effective date of the registration statement did not provide a license to appellants to ignore them. Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors.[14]

13. See Securities Exchange Act Release No. 6864, p. 1 (July 30, 1962).

13a. While the district court found that appellants had engaged in conduct which is proscribed by Rule 10b–9, the court did not specifically find that appellants had violated this rule. Rather, the court held that appellants had violated Rule 10b–5, which also prohibits the conduct proscribed by Rule 10b–9.

14. "The way the new facts . . . are brought to the attention of offerees as a matter of mechanics is by putting a sticker on the prospectus or supplementing it otherwise, not by amending the registration statement." 1 Loss, Securities Regulation 293 (2d ed. 1961, Supp. 1969). See 17 C.F.R. § 230.424(c) (1971).

"The effect of the antifraud provisions of the Securities Act (§ 17(a)) and of the Exchange Act (§ 10(b) and Rule 10b–5) is to require the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect . . . ." SEC v. Bangor Punta Corp., 331 F.Supp. 1154, 1160 n. 10 (S.D.N.Y. 1971). *Accord,* Danser v. United States, 281 F.2d 492, 496–97 (1 Cir. 1960). See 1 Loss Securities Regulation 293 (2d ed. 1961, Supp. 1969).

 While appellants admit that public investors were defrauded, they seek to exculpate themselves from liability for their acts by arguing that they acted in good faith. Appellants' contention that their good faith should bar liability under the antifraud provisions of the federal securities laws, however, must be assessed in light of the Supreme Court's admonition that securities legislation enacted for the purpose of avoiding frauds must be construed "flexibly to effectuate its remedial purposes." SEC v. Capital Gains Bureau, 375 U.S. 180, 195 (1963). It is now well established that "[b]efore there may be a violation of the securities acts there need not be present all of the same elements essential to common law fraud . . . ." Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–91 (2 Cir. 1969). *Accord,* SEC v. Capital Gains Bureau, *supra,* 375 U.S. at 193–95. Moreover, in an enforcement proceeding for equitable or prophylactic relief, such as the one here, we have held that mere negligence is a sufficient basis for liability. Hanly v. SEC, 415 F.2d 589, 597 (2 Cir. 1969); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–55 (2 Cir. 1968) (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 (1969).[15] Accordingly, appellants' claim that they acted in good faith,

even if accepted, would not bar their liability under § 17(a) of the 1933 Act or § 10(b) of the 1934 Act.

We hold, however, that the evidence established that appellants, with the exception of Samuel Feinberg, Marnane and Halford, did not act in good faith. Feinberg,[16] as the district court properly found, has had considerable experience in complex financing arrangements. Thus, it would strain credulity to suggest that Feinberg did not know that the closing on February 20 was invalid. Any doubt about the invalidity of the closing, moreover, must have been completely dissipated by the news that the Netelkos and Deneso checks had been returned for insufficient funds. In addition, even assuming Feinberg reoffered the Netelkos and Deneso shares in good faith, he knew that neither he nor Ezrine had been successful in selling them all and that more than 200,000 of the 450,000 shares involved in the offering were retired without having been purchased. Nevertheless, Feinberg did not attempt to return the proceeds of the offering until the SEC had begun its investigation. In view of these circumstances, it cannot be said that the district court was clearly erroneous in finding that Feinberg knowingly had participated in the fraud. As Judge Learned Hand said in a similar context, ". . . the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force immensely greater than any one of them alone." United States v. White, 124 F.2d 181, 185 (2 Cir. 1941).

Ezrine's claim that he acted in good faith likewise is belied by the evidence adduced at trial.[17] As an experienced securities lawyer, he was well aware that failure to correct a misleading prospectus and retention of the proceeds even though

---

15. We recently have held that more than mere negligence is required in order to permit plaintiffs to recover damages in a private action under § 17(a) or § 10(b). Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971).

16. Feinberg's knowledge is imputed to the corporations which he controlled—appellants Manor, Capital Cities and Manor Construction. See *supra* note 3.

17. Ezrine's knowledge is imputed to the corporations which he controlled—appellants Glendale and Atlantic. See *supra* note 3.

the issue had not been fully subscribed constituted violations of the antifraud provisions of the securities laws. Indeed, Ezrine's knowledge that the federal securities laws required public disclosure of developments which occurred subsequent to the effective date of the registration statement is indicated by his supplementing the Manor prospectus on February 24 to reflect Carlton Cambridge's participation in the offering as an underwriter.

The district court also properly found that Netelkos knowingly violated the antifraud provisions.[18] While Netelkos admits that the prospectus was misleading in several material respects, he claims that he was under no duty to inform public investors that the prospectus did not present an accurate picture. The evidence shows, however, that Netelkos was actively involved in selling the issue and therefore was obligated to bring to the attention of offerees any developments which made the prospectus misleading in any material respect. Moreover, since Netelkos did not pay for his shares, it is clear that he retained some of the proceeds of the offering knowing that all of the 450,000 shares had not been sold and that all of the proceeds had not been received.[19]

As for appellants Samuel Feinberg, Marnane and Halford, the evidence did not show, nor did the district court find, that they had acted in bad faith. Nevertheless, the court correctly held that these appellants had violated the antifraud provisions of the 1933 and 1934 Acts. Each of these appellants received signals which should have alerted them to the fact that the Manor issue was never fully subscribed. On February 20, 1970, all of the selling shareholders received checks from the underwriter representing the proceeds due them from their sales. Four days later, these appellants learned that payment on the checks had to be stopped because the underwriter did not have sufficient funds on deposit to honor the checks. At this point, these appellants should have inquired about the progress of the offering, for if the arrangements described in the prospectus had been followed and the entire issue had been sold, there would be no reason for the underwriter not to have had sufficient funds to cover the checks. Nevertheless, there is no evidence that these appellants even questioned any of the principal figures about the status of the offering. Samuel Feinberg, Marnane and Halford ultimately were paid the amounts of money to which each would have been entitled had the entire issue been sold. These appellants received checks drawn on Manor's account which were signed by Ira Feinberg. Rather than raising any questions as to why the first checks were not honored and why they subsequently were paid by checks drawn on Manor's account, they simply accepted the money. In view of their failure to make any inquiry whatsoever, it is clear that these appellants deliberately closed their eyes to facts which they, as selling shareholders who were to receive a substantial financial benefit, were under a duty to see and to act accordingly. See United States v. Benjamin, 328 F.2d 854, 862 (2 Cir.), cert. denied, 377 U.S. 953 (1964). Whether their conduct be termed lack of due diligence or negligence, the district court properly held that these appellants violated § 17(a) of the 1933 Act and § 10(b) of the 1934 Act.

18. Netelkos' knowledge is imputed to the corporations which he controlled—appellants Method Leasing and Upton. See *supra* note 3.

19. The district court also properly held that appellants Netelkos, Method Leasing and Upton violated § 17(a) of the 1933 Act and § 10(b) of the 1934 Act by obtaining securities from Manor and the selling shareholders without disclosing that they did not intend to pay for them. See Richardson v. MacArthur, *supra*, 451 F.2d at 40–41; A. T. Brod & Co. v. Perlow, *supra*, 375 F.2d at 397.

### III. *Violations of Prospectus-Delivery Requirement of 1933 Act*

In addition to concluding that appellants had violated the antifraud provisions of the federal securities laws, the district court also correctly held that they had violated the prospectus-delivery requirement of Section 5(b)(2) of the 1933 Act.

■ Section 5(b)(2) prohibits the delivery of a security for the purpose of sale unless the security is accompanied or preceded by a prospectus which meets the requirements of Section 10(a) of the 1933 Act, 15 U.S.C. § 77j(a) (1970).[20] To meet the requirements of § 10(a), a prospectus must contain, with specified exceptions, all "the information contained in the registration statement . . . ." In turn, the registration statement, pursuant to Section 7 of the 1933 Act, 15 U.S.C. § 77g (1970), must set forth certain information specified in Schedule A of the 1933 Act, 15 U.S.C. § 77aa (1970). Among the items of information which Schedule A requires the registration statement, and therefore the prospectus, to contain are the use of proceeds (item 13), the estimated net proceeds (item 15), the price at which the security will be offered to the public and any variation therefrom (item 16), and all commissions or discounts paid to underwriters, directly or indirectly (item 17).

■ ■ The Manor prospectus purported to disclose the information required by the above items of Schedule A. The evidence adduced at trial showed, however, that developments subsequent to the effective date of the registration statement made this information false and misleading.[21] Moreover, Manor and its principals did not amend or supplement the prospectus to reflect the changes which had made inaccurate the information which § 10(a) required the prospectus to disclose. We hold that implicit in the statutory provision that the prospectus contain certain information is the requirement that such information be true and correct. See SEC v. North American Finance Co., 214 F.Supp. 197, 201 (D.Ariz.1959); Eugene Rosenson, 40 S.E.C. 948, 952 (1961).[22] A prospectus does not meet the requirements of § 10(a), therefore, if information required to be disclosed is materially false or misleading. Appellants violated § 5(b)(2) by delivering Manor securities for sale accompanied by a prospectus which did not meet the requirements of § 10(a) in that the prospectus contained materially false and misleading statements with respect to information required by § 10(a) to be disclosed.

20. Section 5(b)(2) of the 1933 Act, 15 U.S.C. § 77e(b)(2)(1970) provides:

"(b) It shall be unlawful for any person, directly or indirectly—

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title."

21. For example, the prospectus stated that Manor shares would be sold at the price of $10 per share. The SEC presented evidence, however, that some Manor shares were "sold" to Netelkos for considerably less than $10 per share and that 60,000 shares were sold to Daytona Beach General Hospital for $11 per share. Moreover, the sticker amendment to the Manor prospectus stated that the net proceeds received from the offering was $4,027,500. The evidence adduced at trial, however, showed that this figure was grossly inflated. In addition, the prospectus did not reflect the extra compensation paid to Netelkos for his participating in the offering and therefore did not contain all the commissions and discounts paid to underwriters, as required by item 17 of Schedule A.

22. In analogous situations under the 1934 Act, the SEC has held that the statutory provision that records be kept and that reports be filed by registered broker-dealers embodies the requirement that such records and reports be true and correct. Talmage Wilcher, Inc., Securities Exchange Act Release No. 6284 (June 13, 1960); Hermand Bud Rothbard, Securities Exchange Act Release No. 5998 (June 30, 1959); Pilgrim Securities, Inc., Securities Exchange Act Release No. 5958 (May 15, 1959); Lowell Niebuhr & Co., 18 S.E.C. 471 (1945). See also GAF Corp. v. Milstein, 453 F.2d 709, 720 (2 Cir. 1971).

Manor contends, however, that § 5(b)(2) does not require that a prospectus be amended to reflect material developments which occur subsequent to the effective date of the registration statement. This contention is premised on the assumptions that the prospectus spoke only as of the effective date of the registration statement and that the prospectus contained no false or misleading statements as of the effective date—December 8, 1969. Assuming the Manor prospectus was accurate as of December 8, 1969, appellants' claim is without merit.

In support of their argument that the prospectus need not be amended or supplemented to reflect post-effective developments, appellants cite an administrative decision in which the SEC held that it will not issue a stop order with respect to a registration statement which becomes misleading subsequent to its effective date because of material post-effective events. Funeral Directors Manufacturing and Supply Co., 39 S.E.C. 33, 34 (1959). See also Charles A. Howard, 1 S.E.C. 6, 10 (1934). Under this line of SEC decisions, a registration statement need not be amended after its effective date to reflect post-effective developments.[23] These decisions, however, are not apposite here. Assuming that the registration statement does speak as of its effective date and that Manor did not have to amend its registration statement,[24] appellants were obliged to reflect the post-effective developments referred to above in the prospectus. Even those SEC decisions holding that the registration statement need not be amended to reflect post-effective developments recognize that the prospectus must be amended or supplemented in some manner to reflect such changes. See Charles A. Howard, supra, at 10. In addition, as noted above in Part II of this opinion, the effect of the antifraud provisions of the 1933 and 1934 Acts is to require that the prospectus reflect post-effective developments which make the prospectus misleading in any material respect. There is no authority for the proposition that a prospectus speaks always as of the effective date of the registration statement.[25]

23. The SEC has held that in some situations it may be necessary to amend the registration statement to reflect post-effective changes. As noted in Part II of this opinion, supra note 14, post-effective developments generally are brought to the attention of offerees by putting a sticker on the prospectus or otherwise supplementing it. However, the SEC has held that supplementing the prospectus "is inadequate and misleading when numerous and significant changes in the issuer's affairs . . . have clearly outdated the original prospectus." Franchard Corporation, Securities Act Release No. 4710 (July 31, 1964). We do not reach the question whether merely supplementing the prospectus would have been adequate in the instant case.

24. As to what date the registration statement speaks, there appears to be some ambiguity in the statute. Section 11 of the 1933 Act, 15 U.S.C. § 77k (1970), imposes civil liability on the issuer and other persons "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement . . . ." On the other hand, Section 8(d) of the 1933 Act, 15 U.S.C. § 77h(d) (1970), authorizes a stop order "[i]f it appears to the Commission at any time that the registration statement includes any untrue statement . . . ." (Emphasis added). The House Report supports the view that the SEC can require the issuer to amend the registration statement to reflect post-effective developments:

"In determining whether a stop order should issue, the Commission will naturally have regard to the facts as they then exist and will stop the further sale of securities, even though the registration statement was true when made, [and] it has become untrue or misleading by reason of subsequent developments." H.R.Rep.No.85, 73d Cong., 1st Sess. 20 (1933).

See 1 Loss, Securities Regulation 290 (2d ed. 1961, Supp.1969). In view of our construction of §§ 5(b)(2) and 10(a) of the 1933 Act, we do not reach the question whether the registration statement speaks only as of its effective date.

25. Appellants' reliance on the above line of SEC decisions perhaps is attributable to appellants' misinterpretation of § 10(a) of the 1933 Act which provides that a prospectus "shall contain the information contained in the registration statement

We hold that appellants were under a duty to amend or supplement the Manor prospectus to reflect post-effective developments; that their failure to do so stripped the Manor prospectus of compliance with § 10(a); and that appellants therefore violated § 5(b)(2).

### IV. *Injunctive Relief Granted*

Having concluded that appellants had violated the federal securities laws, the district court permanently enjoined all appellants, except Samuel Feinberg, Marnane and Halford,[26] from further violations of the antifraud provisions of the 1933 and 1934 Acts; and also permanently enjoined appellants Manor, Feinberg, Ezrine, Glendale and Atlantic from further violations of § 5(b)(2) of the 1933 Act. Appellants' claim that the district court abused its discretion in granting such injunctive relief is without merit.

■ In an action, such as the instant one, where the SEC sought injunctive relief under Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1970), and under Section 21(e) of the 1934 Act, 15 U.S.C. § 78u(e) (1970), a district court has broad discretion to enjoin possible future violations of law where past violations have been shown, and the court's determination that the public interest requires the imposition of a permanent restraint should not be disturbed on appeal unless there has been a clear abuse of discretion. SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1306–7 (2 Cir.), cert. denied, 404 U.S. 1005 (1971); SEC v. Culpepper, 270 F.2d 241, 250 (2 Cir. 1959). Moreover, the party seeking to overturn the district court's exercise of discretion has the burden of showing that the court abused that discretion, and the burden necessarily is a heavy one. SEC v. Culpepper, *supra*, 270 F.2d at 250; United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). In the instant case, we hold that appellants have not sustained that burden, for the record amply supports the district court's conclusion that the issuance of a permanent injunction was appropriate.

■ ■ The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated. SEC v. Culpepper, *supra*, 270 F.2d at 249; United States v. W. T. Grant Co., *supra*, 345 U.S. at 633. Here there were several factors which supported the district court's conclusion that a reasonable likelihood of future violations existed. First, fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations, SEC v. Keller Corporation, 323 F.2d 397, 402 (7 Cir. 1963); SEC v. Culpepper, *supra*, 270 F.2d at 250; we believe that the drawing of such an inference was particularly appropriate here where appellants did not attempt to cease or undo the effects of their unlawful activity until the institution of an investigation. Secondly, having in mind that the nature of past violations has an important bearing on the reasonable expectation of future violations, SEC v. Culpepper, *supra*, 270 F.2d at 250; United States v. W. T. Grant Co., *supra*, 345 U.S. at 633, the district court's conclusion below that there was a reasonable ex-

. . . . " While there is a paucity of authority, we believe, contrary to appellants' apparent interpretation, that there may be circumstances where a prospectus does not comply with § 10(a) even though it contains the same information as the registration statement. Thus, a prospectus fails to comply with § 10(a), even though it sets forth the same information as the registration statement, if that information is inaccurate or incomplete. See Eugene M. Rosenson, 40 S.E.C. 948, 952 (1961); SEC v. North American Finance

Co., 214 F.Supp. 197, 201 (D.Ariz.1959). Moreover, where, as here, a prospectus contains the same information as the registration statement, it nevertheless fails to comply with § 10(a) if there was a duty to supplement the prospectus to reflect post-effective developments even though there was no corresponding duty to amend the registration statement.

26. The SEC has not appealed from the district court's denial of injunctive relief as to these appellants.

pectation of future violations was supported by its finding that appellants' "violations were willful, blatant, and often completely outrageous." Thirdly, the fact that these appellants continued to maintain that their past conduct was blameless was a factor appropriately considered by the district court in assessing the need for a permanent injunction. See SEC v. MacElvain, 417 F.2d 1134, 1137 (5 Cir. 1969), cert. denied, 397 U.S. 972 (1970); Hecht Co. v. Bowles, 321 U.S. 321, 331 (1944). Finally, the district court had ample opportunity to evaluate the sincerity of appellants' assurances that they would not again violate the federal securities laws. In view of the inconsistencies in each appellant's testimony and the conflicting stories told by different appellants, the district court was justified in doubting the veracity of appellants' assurances. Under all the circumstances, it cannot be said that the district court abused its discretion in granting permanent injunctive relief.

■■■ Appellants argue, however, that the SEC must show more than a reasonable likelihood of future violations. They maintain that appellants must be shown to have a propensity or natural inclination to violate the securities laws. Appellants' reliance on SEC v. Bangor Punta Corporation, 331 F.Supp. 1154, 1163 (S.D.N.Y.1971), for this proposition is misplaced. There the district court, in concluding under the circumstances there presented that a permanent injunction should not issue, said:

"Under all the facts and circumstances in this case, the Commission has failed to carry its burden to establish, with persuasive evidence, that Bangor Punta, its officers, directors and employees, have a propensity or natural inclination to violate the securities law. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir. June 10, 1971)." 331 F.Supp. at 1162–63.

In relying upon our decision in *Texas Gulf Sulphur*, which applied the reasonable likelihood standard, the district court demonstrated that it was not purporting to apply a new standard for the issuance of an injunction. In any event, we adhere to our well established rule and hold that the SEC has demonstrated the necessity for injunctive relief since there is a reasonable likelihood of future violations on the part of appellants. SEC v. Culpepper, *supra*, 270 F. 2d at 249.

■■■ Appellants also maintain that the district court's abuse of discretion is shown by the fact that appellants had ceased any illegal activities prior to the institution of suit. It is well settled, however, that cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations. SEC v. Keller Corporation, *supra*, 323 F.2d at 402; SEC v. Boren, 283 F.2d 312, 313 (2 Cir. 1960); SEC v. Culpepper, *supra*, 270 F. 2d at 250. As the Supreme Court said in an analogous situation:

"The courts have an obligation, once a violation has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit." United States v. Parke, Davis & Co., 362 U.S. 29, 48 (1960).

■■■ Appellants Manor, Capital Cities and Feinberg claim that an injunction should not have been issued against them because of their good faith reliance on advice of their counsel, appellant Ezrine. As we have held in Part II of this opinion, however, the district court was not clearly erroneous in finding that these appellants knowingly had violated the federal securities laws. While good faith reliance on advice of counsel may be a factor to consider in deciding whether to grant injunctive relief, appellants' proven lack of good faith here precludes them from relying on this argument. Moreover, SEC v. Harwyn Industries Corporation, 326 F. Supp. 943 (S.D.N.Y.1971), upon which

appellants strongly rely, is not to the contrary. Unlike the situation here, the court there found that defendants had relied in good faith on counsel's advice and that counsel's interpretation of the law was "neither frivolous nor wholly unreasonable." 326 F.Supp. at 954.

■■ Appellants Ezrine and Netelkos contend that the issuance of an injunction against them was inappropriate because of the resulting harmful impact on their professional reputations and legitimate business activities. True, in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts. Hecht Co. v. Bowles, *supra*, 321 U.S. at 328–30. Accordingly, the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion. SEC v. Harwyn Industries Corporation, *supra*, 326 F.Supp. at 957; SEC v. Broadwell Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y.1965). The record before us clearly demonstrates that the district court, having considered the harmful impact of injunctive relief on Ezrine's and Netelkos' professional reputations, nevertheless concluded that public investors needed the protection of an injunction. As we said in SEC v. Culpepper, *supra*, 270 F.2d at 250, "The public interest, when in conflict with private interest, is paramount." Moreover, in view of the "blatant" nature of the violations found by the district court to have been committed by Ezrine and Netelkos and in view of their professional occupations which place them in positions where they could misappropriate public investor funds in other offerings, the district court's decision to enjoin them from further violations was not an unreasonable one.

Finally, appellants challenge the scope of the injunctive relief on two grounds. First, they contend that the district court abused its discretion in enjoining appellants from further violations involving any security, rather than just Manor securities. Secondly, appellants claim that the court erred in enjoining them from committing acts which bear little resemblance to their alleged illegal activities. While there is a dearth of authority squarely in point with respect to the appropriate scope of injunctive relief in SEC enforcement actions, we are satisfied that the district court's injunctive provisions are not overly broad under all the circumstances of this case.

■ The principles which we believe to be controlling in regard to the appropriate breadth of injunctive relief are those expressed in NLRB v. Express Publishing Co., 312 U.S. 426 (1941). See Hillsborough Investment Corporation v. SEC, 276 F.2d 665, 667 (1 Cir. 1960). In *Express Publishing* the Supreme Court said: "A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." 312 U.S. at 435. In view of the principal appellants' conduct in the instant case, the district court was justified in believing that an injunction limited to violations involving Manor shares only would not adequately protect public investors. The violations of the federal securities laws committed by appellants Feinberg, Ezrine and Netelkos demonstrated their propensity to use various corporate entities to achieve unlawful objectives. While Feinberg and Ezrine decided to obtain public financing for Feinberg's nursing home business by offering Manor shares, coupled with a complex maze of transactions involving other entities, they could just as easily have decided to secure financing for Feinberg's business by issuing and selling shares in any number of corporations controlled by either or both of them. It is a fair inference, therefore, based on appellants' utilization of various corporate entities to attain their goals, that any future violations of the securities laws might well involve corporate entities other than Manor. This is but-

tressed by the fact that, for all practical purposes, Manor no longer exists. Capital Cities acquired all of its assets on July 27, 1970. If the district court were to enjoin fraudulent transactions involving only Manor and Capital Cities securities, it is not unlikely that yet another corporation controlled by appellants would acquire the assets of the nursing home business and would attempt to obtain public financing. Under the circumstances, it cannot be said that the district court abused its discretion in framing the injunction to cover not merely the security to which the proof directly related, but any security. See SEC v. Seaboard Securities Corporation, CCH Fed.Sec.L.Rep. ¶91,697, at 95,564 (S.D.N.Y.1966); SEC v. Keller Corporation, *supra*, 323 F.2d at 402–03.

 We likewise find no merit in appellants' claim that the district court enjoined violations that bear little resemblance to those which appellants allegedly committed. With respect to the provision enjoining appellants Feinberg, Ezrine, Manor, Glendale and Atlantic from further violations of the prospectus-delivery requirement of § 5 (b)(2) of the 1933 Act, the district court's order merely parroted the language of that Section. There can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated. See Vanity Fair Paper Mills, Inc. v. FTC, 311 F.2d 480, 487–88 (2 Cir. 1962); 3 Loss, Securities Regulation 1978 (2d ed. 1961, Supp. 1969). As for that part of the injunction enjoining further violations of the antifraud provisions of the federal securities laws, the district court framed the order in language virtually identical to that of Rule 10b–5. In view of the various types of fraud committed by appellants, the court was justified in framing an injunction appropriately broad in scope. See SEC v. Keller Corporation, *supra*, 323 F.2d at 402; Los Angeles Trust Deed & Mortgage Exchange v. SEC, 285 F.2d 162, 181 (9 Cir. 1960); 3 Loss, Securities Regu-

lation 1978 n. 19 (2d ed. 1961, Supp. 1969).

## V. Ancillary Relief Granted

In addition to granting the SEC's request for injunctive relief, the district court ordered appellants to disgorge all the proceeds, profits and income received in connection with the public offering of Manor stock; appointed a trustee to receive such funds, to distribute them to defrauded public investors and to report to the court on the true state of affairs; and, to prevent a wasting of assets, ordered a temporary freeze on appellants' assets pending transfer of the funds to the trustee. With the exception of one aspect of these provisions of the district court's order, we hold that the grant of this ancillary relief was a proper exercise of the district court's equity powers. ·

 It is now well established that Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1970), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1970), confer general equity powers upon the district courts. SEC v. Texas Gulf Sulphur Co., *supra*, 446 F.2d at 1307; SEC v. S & P National Corporation, 360 F.2d 741, 750 (2 Cir. 1966); Lankenau v. Coggeshall & Hicks, 350 F.2d 61, 63 (2 Cir. 1965); Esbitt v. Dutch-American Mercantile Corporation, 335 F.2d 141, 143 (2 Cir. 1964). Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy. Thus, while neither the 1933 nor 1934 Acts specifically authorize the ancillary relief granted in this case, "[i]t is for the federal courts to adjust their remedies so as to grant the necessary relief where federally secured rights are invaded." J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964). *Accord*, Deckert v. Independence Corporation, 311 U.S. 282, 288 (1940). Moreover, as ·the Supreme Court said in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391 (1970): "[W]e cannot fairly infer from the

Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies." It is true that *Mills* and *Borak* involved relief to private litigants. Nevertheless, we recently said that "we deem the above statement [in *Mills*] to be fully applicable in enforcement actions by the SEC." SEC v. Texas Gulf Sulphur Co., *supra*, 446 F.2d at 1308. Accordingly, we reiterate our previous holding in *Texas Gulf Sulphur* that the SEC may seek other than injunctive relief to effectuate the purposes of the federal securities laws. 446 F.2d at 1308.

Appellants contend that, even if the district court had the power to grant ancillary relief, the relief granted was inappropriate in this case. We hold, with the exception of the one aspect of the district court's order referred to below, that the grant of ancillary relief in the instant case was supported by ample precedent.

■ Clearly the provision requiring the disgorging of proceeds received in connection with the Manor offering was a proper exercise of the district court's equity powers. The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits. As Judge Waterman said in SEC v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1308: "It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation." *Accord,* SEC v. Golconda Mining Co., 327 F.Supp. 257, 259 (S.D. N.Y.1971). We hold that it was appropriate for the district court to order appellants to disgorge the proceeds received in connection with the Manor offering.

■ Having held that ordering the refunding of the proceeds was a proper exercise of the district court's equity powers, we hold that the court erred in ordering appellants to transfer to the trustee all the profits and income *earned on such proceeds.* As we noted in SEC v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1308, the SEC may seek other than injunctive relief, "so long as such relief is remedial relief and is not a penalty assessment." We believe that ordering the disgorging of profits and income earned on the proceeds is in fact a penalty assessment. This provision of the order cannot be justified as remedial relief to purchasers of Manor shares. As defrauded purchasers in a private enforcement action, public investors would be entitled "to recover only the excess of what they paid over the value of what they got." Levine v. Seilon, Inc., 439 F.2d 328, 334 (2 Cir. 1971). While not conclusive, we think that it is significant that defendants in private litigation would not be required to pay defrauded purchasers the profits on the proceeds. See Janigan v. Taylor, 344 F.2d 781, 786 (1 Cir. 1965). Moreover, refunding the profits on the proceeds cannot be justified as compensation to the issuing corporation for harm done to it by its officers and employees. See SEC v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1308. The concept of harm to the corporation should not apply here, particularly where one appellant, Feinberg, now completely controls the corporation and any compensation paid to the corporation would simply go into his pocket. Furthermore, as previously noted, Manor is now only a corporate shell.

The only plausible justification for this part of the court's order is that the deterrent force of requiring the disgorging of the profits on the proceeds is essential to effective enforcement of the federal securities laws. In balance, however, we believe that the injunctive relief and the requirement that the proceeds be returned are sufficient deterrence to further violations. While compelling the transfer of the profits on the proceeds arguably might add to the deterrent effect of the court's order, this in our view does not justify arbitrarily requiring those appellants who invested

wisely to refund substantially more than other appellants. Accordingly, we reverse that part of the court's order which provides for disgorgement of the profits and income earned on the proceeds, and remand to the district court for modification of its order so as to require appellants to transfer to the trustee only the proceeds received in connection with the Manor offering, together with interest at the New York legal rate from the date appellants received the proceeds. See SEC v. Texas Gulf Sulphur Co., 312 F.Supp. 77, 93 (S.D.N.Y.1970), aff'd, 446 F.2d 1301 (2 Cir.), cert. denied, 404 U.S. 1005 (1971).

 Appellants also contend that the district court abused its discretion by appointing a trustee to receive the proceeds, to distribute them to defrauded public investors and to report to the court on the true state of affairs. Despite the absence of explicit statutory authority, however, we repeatedly have upheld the appointment of trustees or receivers to effectuate the purposes of the federal securities laws. SEC v. S & P National Corporation, 360 F.2d 741, 750 (2 Cir. 1966); Lankenau v. Coggeshall & Hicks, 350 F.2d 61, 63 (2 Cir. 1965); Esbitt v. Dutch-American Mercantile Corporation, 335 F.2d 141, 143 (2 Cir. 1964).

Moreover, while the appointment of trustees should not follow requests by the SEC as a matter of course, the appointment of a trustee in this case was an appropriate exercise by the district court of its equity powers.[27] Because of the conflicting accounts of the Manor offering given by various appellants and the numerous bootstrap transactions, it

was impossible for the district court to determine, on the record before it, the total amount of proceeds collected and the exact amount each appellant received. Thus, the appointment of a trustee to help preserve the status quo while the various transactions were unraveled was necessary to obtain an accurate picture of what transpired. Moreover, without the appointment of a trustee, it would be difficult to implement the court's order to refund the misappropriated proceeds to defrauded public investors. In view of appellants' fraudulent conduct, it was not unreasonable for the court to conclude that it could not rely on appellants to locate purchasers of Manor shares and to refund to them the proceeds of the offering. Accordingly, we cannot say that the district court was unjustified in deciding that these circumstances warranted the appointment of a trustee with specific powers. See SEC v. Bowler, 427 F.2d 190, 198 (4 Cir. 1970); SEC v. Keller Corporation, 323 F.2d 397, 403 (7 Cir. 1963).[28]

While we find that the temporary freeze of appellants' assets presents a more difficult question, we likewise hold that it was not an inappropriate exercise by the district court of its equity powers.

At the outset, we believe that the decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court. One of the chief reasons for requiring defendants to refund illegally obtained proceeds of a public offering is to compensate defrauded inves-

---

27. We assume that the district court in due course will enter an appropriate order providing for payment to the trustee of reasonable compensation for his services and reimbursement of his expenses. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–97 (1970).

28. On November 2, 1971, appellant Feinberg filed on behalf of his controlled companies a voluntary petition in bankruptcy under Chapter XI in the United States District Court for the District of New Jer-

sey. On December 14, 1971, a referee in the bankruptcy court ordered the Chapter XI receiver to take possession of all assets, apparently including the proceeds of the Manor offering, and to proceed to administer the estate. The trustee appointed by the district court in the instant case has contested this ruling. The question as to which fiduciary has priority over the proceeds of the Manor offering is not before us and we make no ruling thereon.

tors. To effect this purpose, there may be circumstances where a district court should temporarily freeze defendants' assets to insure that they will be available to compensate public investors. Freezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed. Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.

 Here, while the question is a close one, we are satisfied that in balance the district court's decision temporarily to freeze appellants' assets was justified. Because of the fraudulent nature of appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money. Moreover, at the time the court's order was entered, a great deal of uncertainty existed with respect to the total amount of proceeds received and their location. Appellants' failure to present evidence to remove this uncertainty warranted a measure designed to preserve the status quo while the court could obtain an accurate picture of the whereabouts of the proceeds of the public offering. In addition, the continued failure of some appellants to furnish the information necessary to a complete understanding of the current situation justified extension of the temporary freeze until appellants have refunded the proceeds.[29] Under the circumstances, we hold that there is no basis for disturbing the district court's finding that a temporary freeze was necessary to protect the public interest.

We have considered appellants' other claims of error and find them to be without merit.

The judgment of the district court is affirmed in all respects except to the extent that it orders disgorgement of the profits and income earned on the proceeds of the public offering; as to this, we reverse and remand for modification of the order in accordance with this opinion.

29. On October 21, 1971, the date the order was entered below the district court requested each appellant to file with the trustee and the court within seven days an affidavit setting forth the exact amount of proceeds each appellant had received and the location of the proceeds. Despite this order, on the day of oral argument, more than a month after the deadline for filing such affidavits, the trustee and the court had not received these affidavits from some of the appellants.