**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**NORTH AMERICAN RESEARCH AND DEVELOPMENT CORP. et al., Defendants.**

**No. 67 Civ. 3724.**

United States District Court, S. D. New York.

March 8, 1974.

William D. Moran, Regional Administrator, S. E. C., New York City, for plaintiff; Donald N. Malawsky, Roger M. Deitz, New York City, of counsel.

Glass & Greenberg, New York City, for defendants North American Research and Development Corp. and K. Ralph Bowman; Lorance Hockert, New York City, of counsel.

Sidney Schreiberg, New York City, for defendant White.

Alfred N. Blumberg, pro se.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This action was commenced in September 1967 by the Securities and Exchange Commission (SEC) against North American Research and Development Corporation (North American) and forty-two other defendants for a permanent injunction against continued

violations of the registration [1] and anti-fraud provisions of the Securities Act of 1933 [2] and the Securities Exchange Act of 1934 [3] and the rules and regulations thereunder.[4] In essence, the defendants were charged, singly and in concert, with selling blocks of unregistered North American stock and with fraudulent conduct in the sale of the stock. As the case progressed from the commencement of suit, when plaintiff applied for preliminary injunctive relief, through an appeal and remand as to some defendants, permanent injunctions or other dispositions were entered as to all defendants except North American, Edward White, its chief executive officer, K. Ralph Bowman, its secretary-treasurer, and Alfred Blumberg, a stock broker who was president of an inactive brokerage firm and who had been engaged in various aspects of the securities business. As to the latter four, preliminary injunctive relief was in effect pending a trial on the merits.[5]

Plaintiff's motion for preliminary injunctive relief was based upon extensive affidavits and testimony taken before then District Judge Walter R. Mansfield. The hearing extended over seven days in January 1968, during which twenty-four witnesses, including the defendants White, Bowman and Blumberg testified. Thereafter, in February 1968, Judge Mansfield rendered a decision and made extensive findings and conclusions of law to the effect that plaintiff had established a strong prima facie case.[6] Preliminary injunctive relief was granted against most defendants, including North American, White and Bowman;

it was denied as to seven defendants, including Blumberg. Upon cross-appeals the order was upheld except insofar as it denied injunctive relief against Blumberg and others, and accordingly was remanded for further proceedings.[7] Upon remand, although afforded the opportunity to introduce additional evidence, Blumberg, as well as the others, elected to stand on the existing record. After hearing oral argument, Judge Mansfield found that Blumberg had violated the registration and anti-fraud provisions of the securities acts in the sale and distribution of North American stocks, and granted a preliminary injunction against him. In September 1972, Judge Motley granted summary judgment against the corporation, North American and Bowman, finding that each had violated the registration and anti-fraud provisions of the securities acts as alleged in the complaint, but reserved for trial the scope of injunctive relief, if any, to be issued against them. Thus, the unresolved issues now before the court are on plaintiff's application for final judgment against White and Blumberg, and if plaintiff sustains its burden of proof, the scope of the relief to be granted against them, North American and Bowman.[8]

The key figure in the affairs of North American was the defendant Edward White, who conceived a scheme to acquire a worthless corporate shell through control of the issued stock of an inactive publicly-held corporation, North American, formerly Utah Fortuna Gold Company. White and the other defendants were charged with promoting dis-

1. Sections 5(a) and 5(c), 15 U.S.C. § 77e(a), (c) (1970).

2. Section 17(a), 15 U.S.C. § 77q(a) (1970).

3. Section 10(b), 15 U.S.C. § 78j(b) (1970).

4. Rule 10b-5, 17 C.F.R. 240.10b-5 (1973).

5. Thirty-four defendants were permanently enjoined, twenty-one by consent and thirteen by default. The action was discontinued against three defendants who stipulated to comply with the acts and rules, and upon their undertakings such an order was entered. The complaint was dismissed as to

one defendant because of death, and one defendant, a Canadian citizen, was never served with process.

6. SEC v. North American Research & Dev. Corp., 280 F.Supp. 106 (S.D.N.Y.1968).

7. 424 F.2d 63 (2d Cir. 1970).

8. When the case was called for trial, Bowman's counsel stated that Bowman would consent to a final judgment of permanent injunction. The court has since been advised that thus far he has not signed the consent to the permanent injunction.

tribution of the balance of the issued stock with a view of introducing it onto the over-the-counter market in the United States, creating a demand for it, instigating the trading of it, and running up its market price, all for the benefit of himself and a group working with him in the distribution of the stock. A thumbnail sketch of the scheme is succinctly set forth by Judge Mansfield:

"On April 27, 1967 White acquired control of such a worthless corporate shell, a Utah company called Utah Fortuna Gold Company, the name of which was later changed by him to North American. Although no market for its stock had existed for years, within three months, as the result of a carefully laid and executed plan of the White-Freeman-Naft trio, approximately 200,000 shares of its stock was distributed via Canadian accounts to broker-dealers and the public in the United States, trading of the stock was initiated on the over-the-counter market, and the price of the stock, as a result of the group's skillful promotion, was run up during the same short period from ½ cent per share over-the-counter to more than $6.00 per share, or more than 1200%, even though the corporation did not carry on any commercial operations during the period and its assets were of doubtful value. On July 20, 1967, the bubble burst when trading in the shares was suspended by the SEC."[9]

The fraud charge centered about a "Progress Report" of North American and oral statements and representations made by individual defendants to dealers and investors. The charge was that the "Progress Report" omitted any financial information and was false and misleading in various other respects, including its portrayal of men working at the North American plant, which gave the impression that it was currently in oper-

ation in July 1967, when in fact the plant had not been operating or in production since 1964. The report was distributed to various stock brokers and investors in the United States and was one of the principal methods used to sell and distribute in the United States shares of North American.

■ Plaintiff at the trial, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, relied in large measure upon the substantial testimony of the twenty-four witnesses who testified and the numerous exhibits admitted in evidence during the seven-day hearing before Judge Mansfield on the motion for preliminary injunctive relief. This court has read and studied the voluminous transcript of that hearing. Plaintiff, in addition to the admissible evidence of the prior proceeding, called at this trial as witnesses defendants Blumberg and White, each of whom, as already noted, testified at the hearing on the motion for preliminary injunctions, at which they were represented by their respective counsel.[10] Judge Mansfield's decision was based, as he noted, not only upon the affidavits submitted by the parties, but upon his "observation and careful appraisal of the witnesses"[11] who testified before him with respect to disputed fact issues. This court, too, has had the opportunity to observe the demeanor of the two defendants White and Blumberg. Each impressed this court as evasive and at times nonresponsive, with a quick and glib explanation for questioned conduct. The printed record of the proceedings before Judge Mansfield also demonstrates in instance after instance evasiveness on the part of these witnesses and a lack of forthrightness in response to questions. Upon the entire record I find the plaintiff has fully sustained its burden of proof that the defendants White, Blumberg and Bowman each violated, and

9. SEC v. North American Research & Dev. Corp., 280 F.Supp. 106, 112 (S.D.N.Y.1968).

10. The defense at this trial was, of course, free to call any witness or offer any additional evidence, but failed to do so.

11. SEC v. North American Research & Dev. Corp., 280 F.Supp. 107, 111 (S.D.N.Y.1968).

participated in the violation by other defendants of, the registration and antifraud provisions of the securities acts, as alleged in the complaint. Plaintiff accordingly is entitled to judgment on the merits.

There remains the issue of the scope of relief. Plaintiff seeks to enjoin the defendants not only against continued violations as to North American securities, but also as to any other security. The defendants oppose any injunctive relief (1) upon a claim that since the SEC suspended trading with respect to North American stock in 1967 no sales have occurred, and (2) that as to other securities there is no showing defendants are likely to engage in illegal activities.

As to the North American stock, which remains unregistered to this date, the record establishes such deliberate conduct in its sale and distribution, in violation of sections 5(a) and 5(c) of the Securities Act of 1933,[12] that there can be no serious question that plaintiff is entitled to the injunctive relief it seeks.

As to other securities, the defendants' past actions and their pervasive conduct with respect to North American, which furnishes a clue to their general attitudes, justify such relief. The defendant Blumberg's violations were not isolated. He made fraudulent statements to a number of persons in the sale of the stock; he was active, in concert with other defendants, in promoting the sale of stock. Blumberg, in addition to acting as a conduit in the sale of shares, distributed copies of the "Progress Report."

Similarly, Bowman was deeply involved as secretary-treasurer in the illicit distribution of the stock. He was instrumental in locating the shell corporation, and from the start was in on the scheme involving North American and worked closely with White and others. He played a major role in the preparation of the false and misleading Progress Report. Bowman, with respect to other securities, had previously been enjoined from violating sections 5 and 17 of the Securities Act of 1933.

As to White, a self-styled promoter, principally of mining stocks, and a securities trader, he was the central figure, if not the master mind, of North American's illicit activities. He has engaged extensively in the promotion of other securities. He was chief executive of a Canadian securities underwriting corporation, whose license was revoked by the Canadian authorities. White continues to maintain a stubborn, even defiant attitude that the North American securities are exempt under section 3(a)(1) of the 1933 Act and also as to the probity of the Progress Report, despite express determinations by the Court of Appeals to the contrary—an attitude that hardly betokens likelihood of compliance with the securities laws.

Each defendant was an active participant with one or more of the other defendants who have heretofore been permanently enjoined from violations of the securities acts with respect to any security; no good reason appears why in the light of their activities the scope of the injunction issued against the current defendants should be less onerous than that imposed upon the codefendants. Nothing in the record as to the current defendants suggests recognition of the wrongfulness of past illicit conduct or offers the promise of future compliance with the securities laws. Under the circumstances, a permanent injunction against future violations of the securities acts is justified.[13]

The foregoing, together with the following, shall constitute the Court's Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

*Acquisition of Control by White*

1. The defendant White, who had been an active promoter of mining

---

12. 15 U.S.C. § 77e(a), (c) (1970).

13. *Cf.* SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

stocks of companies controlled by him, manifested in March 1967 an interest in acquiring control of a corporate shell as the first step in a scheme already referred to, whereby he and others then promoted the sale of stock previously acquired, created a demand for it, and unloaded a substantial portion of their shares upon the purchasing public at greatly inflated prices by fraudulent and manipulative means. Actively associated with him in this scheme from the outset were Sam Freeman, a friend and a Toronto broker, and the defendant K. Ralph Bowman, through whose efforts the Utah Fortuna Gold Company, the empty corporate shell, was located.

2. All but 600,000 shares of the 1,800,000 shares of this inactive company, which White admitted was "virtually worthless," were held by South Utah Mines. Robert A. Johnson, in March 1967, was an officer and director of both companies, as well as the transfer agent of Utah Fortuna Gold Company; he also exercised the "managerial and financial decisions" of Mrs. Mabel McGarry, who was the owner of approximately 75% of South Utah Mines.

3. Johnson, in the latter part of March 1967, after obtaining authority from Mrs. McGarry to sell the 1,200,000 Utah Fortuna Gold Company shares held by South Utah, agreed to sell the control stock to Whitney, and through him to those whom Whitney represented; on April 27 the sale to Whitney was effected; Whitney immediately resold 1,000,000 shares to White and his nominee, Sonia Starr; as prearranged with Johnson, he also transferred 100,000 shares to his (Whitney's) brother and another 100,000 shares to one Glenn, as finders' fees.

*Acquisition of Publicly-Distributed Shares*

4. It was arranged between Freeman, White and Bowman that any additional shares (beyond those acquired by White) would be purchased by the Toronto brokerage firms of J. P. Cannon & Co. (Cannon) and Lars Hagglof & Co., Ltd. (Hagglof). Whitney's brother and Glenn, upon receipt of the finders' fees shares, sold them to Cannon in Toronto. At the same time, Freeman and Frank Naft, who were White's principal associates, instructed Cannon to purchase shares to be offered from Salt Lake City for the accounts of their wives and Freeman's mother-in-law. Subsequent instructions provided for purchases in the names of friends and other relatives.

5. Thereafter, during the period from April 24 to June 6, 1967, through the activities of Bowman, Whitney and Johnson, 553,000 additional shares of Utah Fortuna Gold Company (later North American) were acquired from former stockholders, which shares, together with the 200,000 finders' fees shares, making a total of 753,000, were sold to Cannon and Hagglof as instructed by White, Freeman and Naft.

By June 27, 1967, approximately 96.8% of the 1.8 million shares of the company outstanding was under control of the White-Freeman-Naft trio, including the one million shares held by White and his nominee Sonia Starr, and 753,000 shares acquired through Cannon and Hagglof held in the names of close friends and relatives of the trio. The methods and means of acquisition and the relationship between the White-Freeman-Naft trio and the parties in whose names the stock was held in Toronto indicate that the 753,000 shares were acquired in Toronto with a view to the distribution of all or a very substantial portion of it in the United States.

*Promotion and Distribution*

6. White and his associates took steps to effect a successful redistribution of the shares in the United States. Originally he had planned to transfer some Canadian mining claims to the corporation and then to promote trading in the company's stock; however, when in Salt Lake City in April 1967 to further his purchase of control of Utah Fortuna Gold Company's outstanding stock, a new and more attractive basis for promotion of the stock presented itself.

*The Storrs Process*

7. Bowman, who, as noted above, was a key figure in the acquisition of shares from former stockholders, was the president and controlling stockholder of Thermal Dynamics Corporation (Thermal); Whitney, his partner in the acquisitions, was its secretary.

8. Thermal owned rights to a method by which allegedly pollution-free coke might be produced commercially, called the Storrs Process, and owned an inoperative pilot plant that had been built to test production under the process. White decided to use the Storrs Process as the basis for promoting the sale of Utah Fortuna Gold Company stock. To further that objective, on May 19, 1967, Utah Fortuna Gold Company acquired all the assets of Thermal, including the patent application on the Storrs Process, described as an auto-air pollution device that converted coal into coke.

9. Bowman, in return, received a right to royalties on any coke that might ultimately be produced and 330,000 Utah Fortuna Gold Company shares.

10. The corporate name of Utah Fortuna Gold Company was changed to North American Research and Development Corporation (North American) at a June 19, 1967 stockholders' meeting, at which White voted proxies for 1,500,000 of the total of 1,800,000 shares outstanding. White was then elected chairman of North American's board of directors; Louis Dillman, a Canadian friend of White, its president; and Bowman, its secretary-treasurer.

*The "Progress Report"*

11. White and Dillman, with a professional writer not named as a defendant, then prepared a "sales brochure in the form of a 'Progress Report' pertaining to North American," which was intended as, and in fact was, one of the principal means used to effect distribution into the United States of approximately 200,000 shares held in Toronto accounts.

12. Although the number of minority shareholders prior to White's acquisition varied between about fifty and eighty, which number was necessarily reduced by the time that the White-Freeman-Naft trio had acquired control of 96.8% of the outstanding shares, 1,000 copies of the report were printed and between 200 and 250 were or caused to be distributed by White, Bowman and North American to stock brokers, registered representatives and other prospective purchasers.

13. The Progress Report was materially false and misleading. It painted a glowing picture of a pollution-free fuel market in which the Storrs Process would play a leading part. The report, among other matters, stated that independent tests and appraisals by leading engineering firms indicated a tremendous sales potential; that North American envisaged processing plants strategically located in or near coal mining centers directly owned by the company or by others under a lease or royalty agreement. The rosy picture was furthered with statements that a large market exists in the western United States, with the prospect that a similar demand could be developed throughout the United States and other highly industrialized countries. The report conveyed the impression, contrary to the fact, that North American had the productive capacity and the financial resources to satisfy current as well as potential market demands and to carry out an extensive program of expansion of processing plants in or near coal mining centers.

The report also conveyed the false impression that the plant was in operation in July 1967, when it was distributed to various persons in the United States. Thus, it contains photographs of various units of the plant and process, some of which are entitled "Scenes of Pilot Plant," with men working at the machinery, with the implication of an ongoing operation and current activity. The fact is that the pilot plant had not been operated since 1964 and the economic

practicality of reopening the plant required further study.

There were other misleading statements in the report. Thus, as to the statement that other processing plants would be established around coal mining centers either owned by the company or by others under a lease or royalty agreement, already referred to, the company had no intent to own any of such allegedly contemplated processing plants. White testified to this effect—indeed North American was without the financial resources to undertake such ownership, which involved a capital cost of approximately $450,000 per plant. When the report was disseminated, North American had less than $50,000 available, of which $30,000 would be required to put the pilot plant in operation.

The report suggested that the commercial feasibility of the Storrs Process had been demonstrated. It referred to "Previously conducted feasibility studies . . . " which "indicated that a profitable operation can be anticipated," and suggested that immediate and further tests shall serve to "verify the commercial value of the process." Thus, it conveyed the impression of a profitable operation with verification being in the nature of a pro forma review. White, however, testified that the very first problem to be faced was the question of the feasibility itself.

The defendants' own witness, Charles S. Davis, a consulting engineer, who investigated the plant in May 1967, testified that a feasibility study would take about thirty to sixty days actually running the pilot plant, and only after $30,000 was spent to put it "back into first class operating condition." The Lummus Company recommended a thirty-day trial to determine the feasibility of the process.

The failure of the report to disclose that feasibility studies were required which would take some time before a determination could be made that the plant could be economically operated was a material omission.

Other respects in which the report is misleading and abounds in "ambiguities" and "half truths" are set forth in the opinion of the Court of Appeals.[14]

### Individual Promotional Efforts of Certain Defendants

14. Meanwhile, White, Freeman and Naft had begun promoting the stock to broker-dealers in the United States with a view toward its introduction in the over-the-counter market at the end of June 1967. For example, White and Freeman flew to Los Angeles after the June 19 stockholders' meeting and, with no financial data or other detailed information available, resorted to touting tactics for the benefit of officers and registered representatives of at least two brokerage firms, Bache & Co. and Bateman Eichler, Hills Richards, Inc. They represented that they believed that the company had great prospects. To dramatize the Storrs Process and their purported estimates of the large potential market for anti-pollution coke they displayed a sample of coke, the clear implication being that it had been successfully produced at the pilot plant, although the plant had not operated since 1964.

15. They advised that trading in the shares from the Cannon firm in Toronto would commence in the Los Angeles market on about the 26th or 27th of June "around the $3 range or below" and they made available copies of the "Progress Report." In their efforts to promote the stock, Freeman opined the stock might go up to $100, but White suggested they were going to take it slowly up to $10; that it was bad for a stock to move too fast and that if it went up to 100 that it would attract the attention of the SEC.

16. White also discussed North American with at least two more brokers and actually placed orders for North American stock for at least two persons.

14. SEC v. North American Research & Dev. Corp., 424 F.2d 63, 75–77 (2d Cir., 1970).

*Alfred Blumberg*

17. The aid of others was also enlisted in the scheme of distribution. Blumberg was one such person. He was no stranger to the securities industry. He was president of S. J. Rothman & Co., an inactive New York City brokerage firm, of which he was a principal stockholder and which was registered as a broker-dealer with the Commission from August 1967 to June 1968. He was employed as a registered representative from October 1956 to the spring of 1960 and again in 1962, 1965, 1966 and 1967. He has been a finder and has been so recognized on prospectuses issued in connection with the public sale of securities.

18. Blumberg recommended to and caused the purchase of North American shares by a number of his customers and in instances failed to disclose material facts which he knew, or misrepresented facts, or failed to give complete information as to North American; he solicited the purchase of North American shares and distributed the Progress Report and thereby caused purchases of unregistered shares; he played an active and knowing role in aiding and abetting the principals in the distribution of unregistered stock, as hereinafter indicated.

19. Blumberg and White first discussed North American in Canada. In the early part of June 1967, Blumberg and Morris M. Cooper (Cooper) met White and Freeman in Toronto, Canada; the same four and Naft met in Toronto about two weeks later when Blumberg told White that if White was "going into the pollution deal as a public company he would like to see it"; this meeting occurred shortly before the North American stock was to trade. Blumberg met White a third time, in the company of Cooper, when White showed them a copy of "The Lummus Report," which concerned the extraction of sulphur from coal through heating.

20. In the latter part of June, 1967, Blumberg recommended and touted North American among his customers, friends and associates. At least a score of persons purchased North American shares through the activities of Blumberg. The shares were purchased by such persons upon his recommendation through Dunhill Securities Corp. (Dunhill), a broker-dealer doing business in New York City; other purchases of North American shares were made through Dunhill by Blumberg or persons whose discretionary accounts he handled, or for whom he had authority to act. His purpose in recommending that his customers use the services of Dunhill was to keep the continuity of his clientele until he became established in the securities industry, since he intended to make his living from commissions. All the facts and circumstances surrounding his activities warrant a finding that Blumberg was instrumental in linking Dunhill with its Canadian sources of supply of North American securities.

21. Blumberg had discretion over or purchased for the accounts of Donald Bachman, Diam Trading, S. J. Rothman, Stanley Snyder and Edwin Medlinger, and handled the account of his mother, to whom he recommended the purchase of North American shares.

22. Based upon Blumberg's recommendation, the following persons purchased North American: Myron Thaler, Linda Winokur, Stephen Downey, Milton Jacobs, Muriel Begleiter, Lisa Greenberg, Peter Diaz, Bernard Bernbaum, Adele Spurio, Louisa Corby, Max Jacob and Sheppard Spies.

23. Solomon Schneider (Schneider), who believed Blumberg was in the securities business, upon his recommending North American, purchased 300 shares. Schneider wanted to sell the stock, but didn't at the suggestion of Blumberg, who told him that General Electric was going to build a plant for North American which would make it more feasible, and that the North American stock should be a good investment.

24. Murray Cousins, who believed Blumberg was in the brokerage busi-

ness, purchased 300 shares of North American, relying on the recommendation of Blumberg. Blumberg represented to Cousins that North American was dealing in a fuel to eliminate air pollution and also stated the stock was a good stock, a good buy, and that it would go up. Blumberg gave Cousins the impression that he, Blumberg, was connected with persons involved in North American and that he was a member of the group.

25. Joseph Corby purchased 500 North American shares on Blumberg's recommendation. Blumberg told Corby that North American had a pilot plant and a process for extracting pollutants from coal; that the process had been proven, and that North American had contracts pending with utility companies who use coke in generating steam and electricity. Corby relied upon Blumberg, in part, because his background in the securities industry qualified him to "analyze a stock thoroughly."

*Present Activities of White, North American, Blumberg and Bowman*

26. White is associated with several public companies.

27. White is an officer or director of several public companies in addition to North American. He is president of Illumino Devices. Its shares are traded in the United States, and it issues periodic reports to its shareholders.

28. He is also president of Weege Uranium, Jandon Mines, and Larenim Securities, all located in Canada.

29. Larenim Securities was an underwriter of securities in Toronto. Based upon the North American violations, its license as an underwriter was revoked.

30. White has security brokerage accounts with one broker in the United States and five brokers in Canada. The total value of White's portfolio is half a million dollars.

31. When the market was doing better, White was a "very big trader."

32. As already noted, despite findings by the United States District Court and the United States Court of Appeals to the contrary, White continues to maintain that the Progress Report is "absolutely a fact and the truth." It has not been revised or rescinded. Also he continues to maintain that the shares of North American need not be registered.

33. White has caused many progress reports to be issued for other companies he owns or with which he is associated.

34. Presently, North American is not an operating company. It is however, attempting to revive itself, and has negotiated a contract for a feasibility study of the Storrs Process.

35. White continues to own one million North American shares.

36. Blumberg has been suspended by the Commission from association with any broker or dealer, for sixty days, a suspension that was imposed as a result of the violations that are the basis for this injunction.

37. Nevertheless, Blumberg did not think that it deserved the time or the effort to research North American at the time he decided to buy for himself and others, and would so conduct himself if faced with a similar situation again.

38. Ned J. Bowman Company was registered as a broker-dealer from March 30, 1954 to May 16, 1960, and the defendant Bowman was vice president and a director of Ned J. Bowman Company. He owned 10% or more of the equity securities of the said firm.

On April 18, 1955, in an action commenced by the Commission in the United States District Court for the District of Utah, Ned J. Bowman Company was enjoined from further violations of section 5 of the Securities Act in connection with the sale of Lavender Uranium Corp. stock.

After the institution of administrative proceedings, the Commission, on May 16, 1960, revoked the registration of Ned J. Bowman Company with the Commission.

There, the Commission found that Bowman violated sections 5 and 17 of the Securities Act and sections 10(b) and 15(c)(1) of the Exchange Act in connection with offers and sales of Lavender Uranium Corp. stock.

In administrative proceedings instituted by the Commission against Jonathan & Co., Inc., formerly registered as a broker-dealer, the Commission, on June 30, 1949, revoked the registration of Jonathan & Co. on the basis, among other things, that it had not been appropriately disclosed in filings with the Commission that a branch office of the firm had been sold to four persons who were nominees of Bowman.

On January 26, 1965, a Judgment of Permanent Injunction was entered in the United States District Court for the District of Utah in an action commenced by the Commission enjoining Bowman and Thermal Dynamics Corp. (Thermal) from further violations of sections 5 and 17 of the Securities Act, in connection with the sale of Thermal stock. Thermal formerly owned the rights in the United States to the Storrs coking process, which, as mentioned above, were transferred to North American. Misrepresentations respecting this process were the principal means by which the defendants illegally distributed North American stock to investors in this country.

39. Since the filing of this action to enjoin K. Ralph Bowman from any further violations of the registration and anti-fraud provisions of the federal securities laws Bowman has continued to violate those laws. On June 6, 1969, Judge Thomas F. Murphy of the United States District Court for the Southern District of New York issued a preliminary injunction enjoining Bowman from further violations of the registration provisions of the Securities Act in the offer and sale of the common stock of the Dumont Corporation.

On November 14, 1969, after trial, Judge A. Sherman Christensen of the United States District Court for the District of Utah issued a permanent injunction which enjoined Bowman from violating the registration requirements of the Securities Act with respect to the securities of the Top Notch Uranium & Mining Corporation or any other securities.

40. Blumberg sold 500 North American shares, and realized a profit on those sales.

41. No registration statement has ever been filed with the Commission as to the securities of North American.

42. The means and instrumentalities of interstate commerce or of the mails or means or instruments of transportation or communication in interstate commerce were used in connection with the activities described above.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over the defendants and matters alleged as violations of law herein.

2. Neither the securities nor the transactions alleged herein to be in violation of section 5 of the Securities Act were exempt under either section 3 or 4 of that Act.

3. From on or about April 27, 1967, White, Blumberg and Bowman directly and indirectly, singly and in concert, violated and aided and abetted others in the violations of sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5 in that they:

(a) Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of any prospectus or otherwise or to carry or cause to be carried securities of North American Research and Development Corpora-

 

tion, before a registration statement was filed with the Securities and Exchange Commission as to such securities;

(b) Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell such securities through the use or medium of a prospectus or otherwise, before a registration statement was in effect with the Securities and Exchange Commission as to such securities;

(c) Carried such securities or caused them to be carried through the mails or in interstate commerce by the means or instruments of transportation for the purpose of sale or delivery after sale, before a registration statement was in effect with the Securities and Exchange Commission as to such securities;

(d) Employed devices, schemes or artifices to defraud, engaged in acts, practices or courses of business which operated or would operate as a fraud and deceit upon purchasers and prospective purchasers, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, misleading in connection with the purchase, offer or sale of such securities while making use of the means or instrumentality of interstate commerce or of the mails, or of the means or instruments of transportation or communication in interstate commerce.

4. Permanent injunctive relief is essential to protect the public against these and other illegal acts and transactions of White, North American, Blumberg and Bowman with respect to the securities of North American or any other securities in the future. Unless so enjoined, there is reasonable likelihood that these defendants might continue to engage in violations of the securities laws.

Judgment may be entered accordingly.