**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**Leonard COOPER et al., Defendants.**

**No. 73 Civ. 2508 (EW).**

United States District Court,
S. D. New York.

Aug. 7, 1975.

William D. Moran, Regional Administrator, S.E.C., New York City, for plaintiff; William Nortman, Jeffrey H. Tucker, Stuart Perlmutter, Douglas P. Jacobs, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants; Burton H. Finkelstein, David J. Levenson, Washington, D. C., David M. Lewis, of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The Securities and Exchange Commission ("Commission") instituted this action for preliminary and permanent injunctive relief against seven defendants, charging them with violations or aiding and abetting violations of the registration provisions of the Securities Act of 1933[1] and the anti-fraud provisions of that Act[2] and the Securities Exchange Act of 1934.[3] Thereafter, dispositions were made in the instance of five defendants[4] and the action remained against Amswiss International Corp. ("Amswiss"), a registered broker-dealer, and Glenn Woo, its president, dominant executive and owner of 50% of its stock.

The alleged violations occurred in 1971 and early in 1972 in connection with the underwriting and aftermarket trading in Meridian Fast Food Services, Inc. ("Meridian"), a corporation en-

---

1. § 5(a), (c); 15 U.S.C. § 77e(a), (c).

2. § 17(a); 15 U.S.C. § 77q(a).

3. § 10(b), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1974).

4. A default judgment and permanent injunction was entered in November 1974 against Ramon D'Onofrio and Joanne Daly. Upon court approval of stipulations and undertakings by Richard Kirschbaum, Hyman Temkin and Leonard Cooper, the action was dismissed as to them in February and March 1975.

gaged in the operation and franchise of "drive-thru" retail dairy stores.

The stipulation of facts by the parties set forth in the pre-trial order together with the evidence presented upon the trial abundantly establishes that defendant Ramon D'Onofrio, convicted on a bankruptcy fraud charge in July 1971 in the Eastern District of New York and on a federal securities fraud charge in this District in late 1974, engaged in manipulative practices relating to the purchase and sale of Meridian stock.

The issue before this Court is whether codefendants Amswiss and Woo knew or should have known of D'Onofrio's improper activities and whether they aided and abetted his manipulative practices and other violations of the securities laws. Based upon all the evidence, including particularly the demeanor of Woo at the trial, I find that the SEC has sustained its burden of proof. I find that Woo was, to understate it, not a credible witness. As the Court observed several times during his testimony, it was difficult to determine whether his answers were founded on imagination, assumption or conjecture. Indeed, his own attorney acknowledged that portions of his testimony were so contradictory that some "clarification" was required. Woo was ready with glib but implausible explanations for questionable transactions. A careful word-by-word reading of the trial transcript not only confirms the Court's observation at the time of trial, but reveals a calculated and cunning attempt by Woo, sophisticated in the ways of the securities market, to cover up his role as an active participant and an aider and abetter of D'Onofrio's practices. His entire course of conduct reflects a conscious purpose to obscure his knowing participation in D'Onofrio's fraudulent activities. Indeed, the irreducible minimum finding must be that he deliberately closed his eyes to obvious facts readily observable with respect to the transactions which were at the core of the manipulative practices.[5]

## THE MERIDIAN OFFERING

In late 1968 or early 1969, defendant Leonard Cooper, Meridian's president, asked Woo and Amswiss to underwrite a public offering of 60,000 shares of Meridian's common stock. In May 1969, Woo, on behalf of Amswiss, consented to be named an underwriter, but later withdrew, despite the urgings of his friend D'Onofrio, because the fast food industry and franchise area no longer was glamorous and because Meridian's financial reports were "terrible".[6] Cooper then sought the assistance of defendant Richard Kirschbaum,[7] D'Onofrio's partner, and through Kirschbaum's efforts, Norbert Associates, Inc. became the underwriter of Meridian's March 22, 1971 offering of 60,000 shares at $5 per share. The offering was not registered pursuant to a claimed Regulation A exemption[8] from the requirements of the Securities Act.[9] Under the

---

5. *United States v. Natelli*, 527 F.2d 311 (2d Cir. 1975) ; *United States v. Bright*, 517 F.2d 584 (2d Cir. 1975) ; *United States v. Joly*, 493 F.2d 672, 675–76 (2d Cir. 1974) ; *United States v. Brawer*, 482 F.2d 117, 128–29 (2d Cir. 1973), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1975) ; *United States v. Jacobs*, 475 F.2d 270, 287–88 (2d Cir.), *cert. denied sub nom. Lavelle v. United States*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973) ; *Dlugash v. SEC*, 373 F.2d 107, 109 (2d Cir. 1967) ; *United States v. Benjamin*, 328 F.2d 854, 863 (2d Cir.), *cert. denied sub nom. Howard v. United States*, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

6. Indeed, that was the fact. When the company made its public offering, the offering circular stated that Meridian was insolvent, had never operated profitably and that management had no intention of paying any dividends in the foreseeable future.

7. Kirschbaum had been the secretary of Amswiss in 1969 ; in the summer of that year, he became D'Onofrio's partner. His mother bought preferred stock in Amswiss in the amount of $15,000 and when Amswiss was tardy in paying her for her stock after repurchasing it, D'Onofrio wrote Woo to find out what the problem was.

8. *See* 17 C.F.R. § 230.251 *et seq.* (1974).

9. § 5, 15 U.S.C. § 77e.

terms of the underwriting agreement, 22,000 shares had to be sold by June 22, 1971, failing which the underwriting would be withdrawn and all funds received would be returned to subscribers.

By June 11, Norbert Associates had not sold a single Meridian share to the public. Cooper again sought, and this time obtained, Woo's assistance. Woo sent Meridian's offering circular to fifteen broker-dealers and formed a selling group composed of Amswiss and six other firms. Cooper solicited many of his friends, relatives and business acquaintances to purchase Meridian, as a result of which twenty-four purchasers bought, in varying amounts, 6,300 shares. All of these orders were executed by Amswiss. Cooper also submitted the names of other potential customers to Woo, who referred them to various members of the selling group, indicating the number of shares to be purchased by these individuals. These other members of the selling group executed the sale of an additional 1,200 shares to Cooper's friends, relatives and business acquaintances. The selling group generated no sales on its own. Another 1,600 shares were sold, of which 1,100 shares were acquired by D'Onofrio's brother, sister and four of his friends.[10] Four days before June 22, the end of the offering period, only these sales totaling 9,100 shares had been made, less than one-half the minimum number of 22,000 shares, failing which the underwriting would be withdrawn. Efforts were thereupon intensified to close the gap. Cooper succeeded in getting his friend and business associate, Richard Hartman, a lawyer, to purchase 13,500 shares through Amswiss.

Thus, with the help of Woo and Amswiss, 22,600 shares were sold by June 22, 1971, of which 20,400, involving thirty purchases, were executed by Amswiss. All but 500 shares were sold to thirty-seven acquaintances of either Cooper or D'Onofrio. Upon the closing of the offering, Meridian received only $38,363 from the net sale proceeds of $75,363, after payment of expenses and certain debt obligations, which still left it insolvent. Amswiss, as a member of the selling group, received $7,140.

## THE AFTERMARKET TRADING IN MERIDIAN

With the underwriting completed, Woo arranged for two broker-dealers to make a market for the over-the-counter trading in Meridian. The trading in the aftermarket demonstrates conclusively that forces other than supply and demand were at work.

In a thirty-day period between July 30 and August 30, 1971, all of Cooper's friends, relatives and business acquaintances, with the notable exception of Hartman, sold their shares through Amswiss at prices of $5 to $5¾ per share. About August 11, Woo advised Cooper that some Meridian shares could be sold and thereafter, at Cooper's instructions, Amswiss executed virtually all the aforementioned sales. Then, during the ten-day period from August 31 to September 10, Hartman liquidated his entire stock block of 13,500 shares at prices ranging between $6½ and $7 per share through in-house crosses by Amswiss (i. e., Amswiss was broker for both the buyer and seller), despite the fact that shortly before this time Woo had told Hartman that the market would not absorb any sizeable block, much less his holding of over half Meridian's publicly traded shares.

Amswiss sold 11,900 of Hartman's shares to a Swiss bank, the Bank Vom Linthgebiet ("Bank"), that had shown no interest in the offering itself. This sudden interest by the Swiss Bank in Meridian's shares was no accident. In the background was D'Onofrio, who Woo knew had a firm in Switzerland and whose partner was a shareholder in the

---

10. Five of these individuals had accounts at Amswiss; D'Onofrio had a limited power-of-attorney over two of these accounts. D'Ono-frio either placed the order for or recommended the stock to these five.

Bank. Despite Woo's typically evasive statements, there can be no doubt that the Bank's purchases were stimulated by D'Onofrio, who Woo knew was "semi-interested" or "semi-active" in Meridian. Moreover, Woo knew that D'Onofrio used Swiss bank accounts and as early as 1968, Woo had signed papers authorizing D'Onofrio to open a Swiss bank account in Woo's name.

As of September 17, 1971, the Bank had accumulated 18,000 shares in little over a month's time. Most of the other outstanding shares were held by friends, relatives and business associates of D'Onofrio. Meridian was then selling at $8¼. From September 17, 1971 to February 16, 1972, when the Commission suspended trading in Meridian, this stock that Woo thought was "grossly over-priced" at $5 rose from $8–$9 to $17–$20 a share. At $20 per share, the 22,-500 shares of an insolvent and essentially worthless company had been run up to a market value of $450,000.

This startling rise in the price of Meridian was not the result of normal market activity but is readily explained on the basis of the evidence. The Bank first "cornered the market" or acquired a "box" in Meridian by purchasing 18,000 shares at prices up to $7 per share and after thus acquiring effective control over the trading, it and D'Onofrio's friends engaged in a series of transactions, primarily in small quantities of 100 or 200 shares, at progressively higher prices. Manipulation by the Bank in the trading of Meridian shares is definitively demonstrated by the Bank's transactions on November 16, 1971, when the Bank both sold 500 shares at $15 and bought 200 shares at $17½. The trading over the eight-month period following the offering stands in marked contrast to the offering itself in which not a single share was sold until Cooper had his friends buy just enough shares to prevent the offering from failing altogether. The evidence thus reveals a classic manipulative scheme to raise the price of Meridian through controlled trading, a price rise which undisputedly "bore no logical relationship to the company's business",[11] as Woo himself admitted.

The evidence also establishes that the architect of this operation was the defendant D'Onofrio. As already indicated, on September 17, 1971, the Bank had acquired 18,000 or about 80% of Meridian's public shares and the remaining shares or "float" were almost exclusively in the hands of D'Onofrio's wife, relatives, attorney, business associates, friends and friends of friends. While defendants Amswiss and Woo argue that there is no direct evidence that the Bank was acting for an account controlled by D'Onofrio, circumstantial evidence leaves no doubt that this was the fact.

The stock transactions themselves establish that the Bank was necessarily acting for an individual who was coordinating the Bank's trades with those of the few other Meridian shareholders, most of whom had one thing in common —a relationship to D'Onofrio. The Bank itself had no relationship to any of the other Meridian shareholders. It was not happenstance that the Swiss Bank, one of whose shareholders was a partner of D'Onofrio, suddenly manifested an interest in the $5 stock of an unknown company in the United States. Given D'Onofrio's knowledge of and experience in the securities market, it is inconceivable that he would have put his friends, relatives and attorney into the manipulated trading of Meridian without having effective control over the Bank's trading.

D'Onofrio's interest in Meridian was long standing and continuous. He encouraged and assisted Cooper in the public offering and asked Amswiss and Woo to do the underwriting. His friends and relatives bought shares in the offering. In 1971, he was actively

---

11. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 810 (2d Cir. 1975).

seeking to assist Meridian by merger or otherwise to resolve the corporation's difficulties. Eventually, Meridian did merge with Radiation Services Associates in February 1972, for which D'Onofrio received 26,159 shares of Meridian and his company and associates received another 123,298 shares as a finder's fee.[12]

D'Onofrio was instrumental in the Bank becoming Amswiss' customer and he did not hesitate to inquire of his friend Woo about the Bank's market activity in Meridian. That D'Onofrio was controlling the Bank's trading is also demonstrated by Woo's own inquiries to D'Onofrio as to whether he was behind the Bank's trading, and by D'Onofrio's revealing response that if Amswiss and Woo get a little stock business here and there they should be grateful about it and not ask any questions.

## WOO AND AMSWISS SHOULD HAVE KNOWN AND DID KNOW OF THE MANIPULATIVE SCHEME

Woo's own testimony, on its face, demonstrates that at the very least he should have known of the manipulation of Meridian trading, which he aided and abetted. As a sophisticated, experienced and knowledgeable broker, he would have had to have been blind not to have seen what was going on and that the Bank was the nominee for D'Onofrio.[13]

■ Woo testified that he did not think the Meridian offering would get off the ground, that no sales were made by the selling group he formed other than to those whose names Cooper had

given to him, that it was a very small underwriting, that "nobody gave two hoots about on Wall Street", that Meridian was "grossly overpriced" at its offering of $5 per share and much more overpriced as it was traded, that he knew of no reason why a Swiss bank would be buying it—especially in such volume when it could purchase the shares at a lower price directly from the company, that the company's financial statements were "terrible", and that the company was struggling. Despite all this, and despite his telling Hartman that the trading in Meridian was "a buyer's market" that could not absorb Hartman's block of stock, Woo and Amswiss, in a ten-day period, sold all of Hartman's 13,500 shares and bought 11,900 of these shares for a bank that had shown no interest in the offering but a few months earlier. The Bank's heavy purchases were so abnormal and ill-advised in Woo's opinion that he admitted asking D'Onofrio who was behind the Bank's trading. Further, Woo admitted having an "inkling" that D'Onofrio had "interested" the Bank in the stock. It would be difficult to give a better illustration of negligently aiding and abetting fraudulent stock manipulation than Woo's willingness to continue active dealing in Meridian shares despite the facts of which he was aware. If he did not know that something was wrong, these facts certainly should have put him on the alert, especially D'Onofrio's statement that he should look the other way, not ask questions, and be happy with his commissions.[14] Clearly Woo should have been able to conclude that his acts were being used in furtherance of illegal ac-

---

12. In addition, on December 20, 1971, International Fund for Mergers and Acquisitions, S.A., with which D'Onofrio was associated, received 238,000 Meridian shares. These holdings, of course, became increasingly valu‑ able as the price of Meridian was manipulated upwards.

13. *See* note 5 *supra.*

14. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975) (officer of

broker-dealer enjoined where officer continued trading shares of company at increasingly higher prices that bore no reasonable relation to the company's business notwithstanding unanswered inquiries to the company requesting additional information and where officer knew that one trader was purchasing the vast majority of the company's shares but never saw fit to seek an explanation for this purchasing activity).

tivity. Thus the Commission has abundantly established the degree of negligence on the part of the defendants which entitles it to relief in this enforcement action.[15]

The evidence establishes, however, that Woo was not just negligent but that he wilfully aided and abetted the contrived stock trading. Woo did not merely overlook the unrealistic buy and sell orders and the suspicious price jumps in Meridian, he was aware of the plot to manipulate Meridian and knowingly and wilfully joined the scheme to help it succeed.

■ Defendants' argument that they had nothing to gain by assisting others in a fraudulent scheme cannot eliminate the evidence of their wilful involvement in the fraudulent stock transactions and is no defense to this enforcement action.[16] Moreover, Amswiss profited by its sales during the offering and its commissions in market trading. In July 1971, soon after the offering, Woo began to work on a merger proposal for Meridian. Had he succeeded, Amswiss would have received 210,000 Meridian shares as a finder's fee. And it is not without interest that when the stock reached its high price of $20 a share in February 1972, the value of those shares at that quotation would be in excess of $4,000,000.

■ The interrelationships of Woo, Cooper, D'Onofrio and both Cooper's and D'Onofrio's friends in the offering and later in the aftermarket trading reveal a well calculated plot that commenced with the underwriting itself. The defendants' claim that Amswiss had only a "merely mechanical role as executing broker in unsolicited transactions" is sheer pretense. Cooper, who was also an attorney for D'Onofrio, obtained Woo's help to make the underwriting successful. Woo knew D'Onofrio had urged Cooper to make a public offering of Meridian shares. D'Onofrio also encouraged Woo to be the underwriter. Woo and Amswiss helped Cooper in the offering by making sales to those individuals Cooper suggested and there is no adequate explanation for Cooper's not giving the list of his friends and acquaintances to Meridian's underwriter, Norbert Associates. Woo then needlessly formed a selling group (since the only sales the other members of the group made were to individuals Cooper told Woo about) and later, despite his low opinion about the stock, solicited broker-dealers to make a market in Meridian, thus creating the illusion of greater interest in Meridian than if Amswiss alone entered quotations.[17]

Woo knew that after the offering was completed Cooper's friends were selling their shares through Amswiss. His answer that he does not "recollect" whether he was curious when Cooper's friends all coincidentally dumped their shares hardly demonstrates an innocent state of mind for such a sophisticated broker. To the contrary, it is further evidence of his studied indifference to obvious events. Rather than being unaware of the activity in Meridian, Woo was sufficiently interested in Meridian that from time to time he would contact the two market makers in the stock to learn who was buying it. Significantly, Woo's firm entered the "pink sheets" as cor-

---

15. *SEC v. Management Dynamics, Inc., supra; SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541–42 (2d Cir. 1973) ; *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096 (2d Cir. 1972) ; *Hanly v. SEC,* 415 F.2d 589, 595–596 (2d Cir. 1969) ; *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854–55 (2d Cir. 1968) (*en banc*), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed. 2d 756 (1969).

16. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed. 2d 237 (1963) ; *SEC v. North American Research & Development Corp.,* 424 F.2d 63, 82 (2d Cir. 1970) ; *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 861 (2d Cir. 1968) (*en banc*), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

17. *See SEC v. Management Dynamics, Inc., supra.*

respondent for one of the market makers.[18]

Woo's own statements and conduct establish that he could not help but know that Meridian was being manipulated and that Amswiss was aiding and abetting this manipulation. The various indicia of stock fraud that Woo admitted being aware of and that prompted him to question the soundness of the Bank's transactions have already been outlined. Entirely apart from D'Onofrio's relationship with the Bank. Woo could not ignore this objective evidence and continue to have Amswiss serve the Bank and execute trades in Meridian without knowingly aiding and abetting the manipulative activity. Woo's relationship with D'Onofrio and his questions to him, however, prove that he knew that D'Onofrio was responsible for the Bank's trading, for this was not the first time these two men had cooperated. In 1968 they were business partners; Woo in that year signed documents so that D'Onofrio could open a Swiss bank account in Woo's name; Woo also acted as D'Onofrio's nominee to help him settle some judgments against him, settlements which eventually led to D'Onofrio's pleading guilty to bankruptcy fraud in July 1971 just about the time the trading in Meridian commenced; Woo hired D'Onofrio's son as a runner for Amswiss; and D'Onofrio referred underwritings and customers to Amswiss. Woo kept D'Onofrio informed of merger proposals for Meridian. D'Onofrio repeatedly asked Woo about the market activity of Meridian and Woo repeatedly made inquiries of D'Onofrio as to the Bank's trading. The defendants' suggestion that connecting Woo with D'Onofrio's manipulation is merely guilt by association ignores the simple, telling facts.

Final evidence of the defendants' wilful participation can be seen in questionable transactions executed by Amswiss as to which Woo offered his usual fumbling, contradictory and unbelievable explanations. For example, on August 31, while its customer Hartman was attempting to liquidate his holdings and the Bank telexed an order to buy 4,000 shares, Amswiss, instead of crossing the orders completely, sold the Bank 2,900 shares from Hartman and 1,100 from a market maker, to whom Amswiss had sold 1,100 shares the day before.[19] Similarly, Woo could not explain why on September 10, 1971, when the Bank cabled Amswiss to buy 1,000 to 2,000 shares at $6¾ per share and Hartman was ready to sell at $6¾, Amswiss cabled the Bank that 1,000 shares were available at $7, rather than $6¾. Finally, although as of August 30 the Bank and Hartman were both interested in a major transaction as demonstrated by the fact that within ten days, Hartman had sold 13,500 shares and the Bank had purchased 11,900 of those shares, this exchange was not executed as a block transaction but rather was the result of a series of nine trades through Amswiss at prices ranging from $6½ to $7. The evidence compels the conclusion that the only explanation for Woo's conduct on these occasions is that he was motivated by a desire to create the appearance of market activity in Meridian at successively higher prices.

In light of all the objective facts, Woo's protestations of innocence and unawareness of D'Onofrio's manipulative conduct flies in the face of reality.

18. A correspondent is a broker-dealer who enters the pink sheets on behalf of another broker-dealer. The broker-dealer for whom the correspondent is acting usually does not have the qualifications, e. g., the capital requirements, to enter a quotation in the pink sheets on its own.

19. As part of Woo's rambling explanation for Amswiss' failure to give its customer the full benefit of the Bank's offer to buy, Woo said it was necessary to create an open market transaction to justify the price of the in-house cross of Hartman and the Bank. This statement contradicts his claim that in-house crosses are away from the market and have no effect on it and is inconsistent with Amswiss' conduct on other occasions in crossing the Bank's order without going to a market maker to create an open market trade.

As Judge Learned Hand so aptly put it in a similar context, "the sum is often greater than the aggregate of the parts, and the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force immensely greater than any one of them alone."[20]

Upon all the evidence, the Court finds that defendants Woo and Amswiss wilfully violated and aided and abetted violations of the anti-fraud provisions of the securities laws.

In addition, the evidence amply demonstrates that these defendants were aware of the manipulative scheme at the time they participated in the Meridian offering. For example, it is inconceivable that Cooper could induce his business associate, Hartman, described by Woo as a "sophisticated investor", to purchase 13,500 shares in an insolvent company without a contemporaneous arrangement to repurchase these shares in the aftermarket, which was done at a profit for Hartman of $18,000 to $20,000. Woo was aware of this plan at the time of the offering and shortly thereafter Amswiss effected the trades that took Hartman·out of the stock and delivered the shares to the Bank. The Meridian offering circular was false and misleading in light of the circumstances then existing because it did not disclose the fraudulent scheme planned for Meridian. Since a term and condition of the claimed Regulation A exemption was breached by this false and misleading circular,[21] the claimed exemption from the registration provisions of the Securities Act of 1933 was lost. Amswiss and Woo thus violated these registration provisions by selling and offering to sell unregistered securities.[22]

Prior to the closing of the Meridian offering, a recission offer letter, the provisions of which had been revised pursuant to conversations between the Commission and counsel for Norbert Associates, was sent by Amswiss to those who purchased Meridian from Amswiss. The letter disclosed Amswiss' participation in the offering since Amswiss had not been named as an underwriter. The defendants argue that because they sought the advice of the SEC on this item and because they informed the Commission of the purchasers in the Meridian offering (including Hartman's purchase of 13,500 shares), the Commission is equitably estopped from contending that they violated the securities laws in any way by their activities in connection with the offering. The argument is frivolous. Woo was preparing a defense in advance of his offense. Merely consulting the SEC on a rescission offer's terms and reporting the names of purchasers in an offering does not immunize the parties involved in the offering. The defendants did not inform the SEC of the fact that the offering was but the first step in a planned stock manipulation. Moreover, defendants' estoppel argument is legally unsound because the Commission cannot waive compliance with an act of Congress and the doctrine of estoppel may not be invoked in these circumstances.[23]

### INJUNCTIVE RELIEF

The standard governing the issuance of injunctive relief in a Commission enforcement action is whether or not there is a reasonable likelihood

---

20. *United States v. White*, 124 F.2d 181, 185 (2d Cir. 1941).

21. Rule 256e, 17 C.F.R. § 230.256e.

22. § 5(a), (c); 15 U.S.C. § 77e(a), (c).

23. *Capital Funds, Inc. v. SEC*, 348 F.2d 582, 588 (8th Cir. 1965); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78, 82 n. 8 (2d Cir. 1961), *cert denied*, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); *SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1959); *SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953); *SEC v. Harwyn Indus. Corp.*, 326 F.Supp. 943, 956 (S.D.N.Y.1971). *See also Reserve Life Ins. Co. v. Provident Life Ins. Co.*, 499 F.2d 715, 722 n. 9 (8th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 803 (1975).

that the violations will be repeated.[24] Defendants' claim that there has been no showing that they were engaged in violations of the securities acts at the time the action was filed does not in itself warrant a denial of injunctive relief.[25] Of course, past violations permit the inference that future violations are likely to occur,[26] especially so where, as here, the defendants insist that their conduct was legal in spite of the fact that their violations were wilful and blatant.[27]

■ Moreover, in another action instituted in this Court by the SEC against Woo, Amswiss and others, charging a similar manipulative scheme with respect to another stock, Judge Gagliardi rendered an opinion on May 23 sustaining the Commission's allegations and found that permanent injunctive relief was warranted, and that the defendants should be enjoined from future violations of the securities laws with respect to the security there at issue and any other securities.[28] Similar conduct with respect to other securities suggests a propensity or natural inclination to violate the federal securities laws.[29]

■ Taking into account the equitable consideration that injunctive relief may have adverse collateral effects on those engaged in the securities industry,[30] the Court is nevertheless convinced that the public interest requires that investors be protected from broker-dealers and their officers who, in the face of abnormal and fraudulent stock transactions, are willing to look the other way and continue dealing in the security after being told that if they get a little stock business here and there they should be grateful about it and not ask any questions. Accordingly, the Court enjoins Woo and Amswiss [31] from violating the registration and anti-fraud provisions of the securities laws in Meridian or any other stock.[32]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered accordingly.

---

24. *SEC v. Management Dynamics, Inc., supra; Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 394, 405–06 (2d Cir.), *cert. denied*, 414 U.S. 910, 924, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) ; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) ; *SEC v. Boren*, 283 F.2d 312, 313 (2d Cir. 1960) ; *SEC v. Culpepper*, 270 F.2d 241, 249–50 (2d Cir. 1959). *See United States v. W. T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ; *Hecht Co. v. Bowles*, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

25. *SEC v. Management Dynamics, Inc., supra; SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972) ; *SEC v. Boren*, 283 F.2d 312, 313–14 (2d Cir. 1960) ; *SEC v. Culpepper*, 270 F.2d 241, 250–51 (2d Cir. 1959) ; *SEC v. Torr*, 87 F.2d 446, 449 (2d Cir. 1937).

26. *SEC v. Management Dynamics, Inc., supra; SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) ; *SEC v. Keller Corp.*, 323 F.2d 397, 402 (7th Cir. 1963) ; *SEC v. Culpepper*, 270 F.2d 241, 251 (2d Cir. 1959).

27. *SEC v. First American Bank & Trust Co.*, 481 F.2d 673, 682 (8th Cir. 1973) ; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100–1101 (2d Cir. 1972) ; *SEC v. North American Research and Development Corp.*, 375 F.Supp. 465, 468 (S.D.N.Y.1973), *aff'd*, 511 F.2d 1217 (2d Cir. 1975).

28. No formal judgment has yet been entered.

29. *SEC v. Spectrum, Ltd.*, 489 F.2d 535, 542 (2d Cir. 1973).

30. *SEC v. Management Dynamics, Inc., supra; SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972).

31. Under agency principles clearly applicable in SEC enforcement actions, Amswiss is liable for the acts of its president Woo. *SEC v. Management Dynamics, Inc., supra; Fey v. Walston & Co.*, 493 F.2d 1036, 1051–53 (7th Cir. 1974) ; *Lewis v. Walston & Co.*, 487 F.2d 617, 623–24 (5th Cir. 1973) ; *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1130 (4th Cir. 1970) ; *Armstrong, Jones & Co. v. SEC*, 421 F.2d 359, 361–62 (6th Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).

32. *See* § 20(b) of the Securities Act, 15 U.S.C. § 77t(b) ; § 21(e) of the Securities Exchange Act, 15 U.S.C. § 78u(e).